**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

In re: KOREAN AIR LINES CO., LTD.,
ANTITRUST LITIGATION,

SOON JA CHUN, Individually and
on behalf of all others similarly
situated; BERNARD JUNG KIM,
Individually and on behalf of all
others similarly situated;
ELIZABETH BAHN,
    *Plaintiffs-Appellants,*

    v.

KOREAN AIRLINES COMPANY, LTD.;
ASIANA AIRLINES INC.,
    *Defendants-Appellees.*

No. 08-56385

D.C. No.
2:07-cv-06542-
SJO-AGR

OPINION

Appeal from the United States District Court
for the Central District of California
S. James Otero, District Judge, Presiding

Argued and Submitted
September 2, 2010—Pasadena, California

Filed April 18, 2011

Before: Alex Kozinski, Chief Judge,
Diarmuid F. O'Scannlain and Ronald M. Gould,
Circuit Judges.

Opinion by Judge Gould

## COUNSEL

Patrick J. Coughlin, Joseph D. Daley, Frank J. Janecek, Jr., and Mary Lynne Calkins of Coughlin Stoia Geller Rudman & Robbins LLP, and Christopher M. Burke and Kristen M. Anderson of Scott + Scott LLP, for the plaintiffs-appellants.

Ian Simmons, Sri Srinivasan, Irving L. Gornstein, Alexander Okuliar, Kathryn E. Tarbert, and Anton Metlitsky of O'Melveny & Myers LLP, and Willard K. Tom, Peter E. Halle, J. Clayton Everett, Jr., and Joseph Brooks of Morgan, Lewis & Bockius LLP, for the defendants-appellees.

## OPINION

GOULD, Circuit Judge:

Plaintiffs Soon Ja Chun, Bernard Jung Kim, and Elizabeth Bahn ("Plaintiffs"), acting individually and on behalf of those similarly situated, appeal the dismissal of their putative class action asserting antitrust claims against Defendants Korean Air Lines Co., Ltd. and Asiana Airlines, Inc. ("Defendants" or "Korean Air and Asiana"). Before its dismissal, their case was one of many similar suits pending against Defendants on the same multidistrict litigation docket. Plaintiffs allege that the fares they paid for airline tickets were unlawfully excessive, in violation of both state and federal antitrust and consumer protection laws. The district court dismissed Plaintiffs' state law claims as preempted by federal law and denied Plaintiffs' motion to amend their complaint to add federal

claims, effectively extinguishing Plaintiffs' case. Thereafter, Plaintiffs' complaint was dismissed with prejudice.

We have jurisdiction, pursuant to 8 U.S.C. § 1291, to review the district court's dismissal. We hold, as a matter of first impression, that the Airline Deregulation Act of 1978, 49 U.S.C. § 41713, preempts state regulation of foreign air carriers, and we affirm the district court's dismissal of Plaintiffs' state law claims. We conclude that the district court erred in denying Plaintiffs leave to amend to add federal claims. To the extent that Plaintiffs seek review of the interlocutory case management order governing the pretrial coordination of pending cases in the same multidistrict litigation, however, we lack jurisdiction to review such non-final decisions. We affirm in part, vacate in part, and remand for proceedings consistent with this opinion.

# I

Plaintiffs allege that Defendants illegally conspired to impose a surcharge on passenger airfares. Plaintiffs are indirect purchasers of airline tickets; that is, they did not purchase tickets directly from Korean Air or Asiana but instead bought them from direct purchasers such as travel agents and consolidators.

Plaintiffs brought their action for violations of federal antitrust and related state laws in the Central District of California. Their initial complaint sought damages and injunctive relief under the Sherman Act, and under state antitrust and unfair competition laws, on behalf of two putative classes. The case was transferred intradistrict to Judge S. James Otero, to whom similar actions, alleging virtually identical conduct, had been sent for pretrial purposes as part of multidistrict litigation ("MDL"). *See In re Korean Airlines Co., Ltd. Antitrust Litig.*, No. 07-ml-01891 (C.D. Cal. filed Dec. 28, 2007) (hereinafter "MDL No. 1891").[1] The district court consolidated the

---

[1]We grant Plaintiffs' motion to take judicial notice of documents in MDL No. 1891. *See United States v. Wilson*, 631 F.2d 118, 119 (9th Cir.

case with other pending cases and ordered that all plaintiffs together file an amended consolidated complaint.

Shortly thereafter, Plaintiffs filed an amended complaint, asserting then that their action was "brought only under state laws and only on behalf of *indirect purchasers* of Korean Air and Asiana passenger tickets" (emphasis in original). In a status report tendered to the district court, Plaintiffs urged that their case differed from the other consolidated MDL cases, in that it was the only case that involved the indirect purchase of tickets from travel agents or consolidators rather than direct purchase from the airlines, and they recommended that the "direct" and "indirect" cases be placed on coordinated but separate tracks for pretrial purposes. At the next status conference, the district court accepted this division and set out parallel briefing schedules for Plaintiffs' indirect purchaser action and the consolidated direct purchaser actions. Plaintiffs' counsel, as the only firm to have brought a case with indirect purchaser plaintiffs, was appointed as interim counsel to pursue indirect purchaser actions. The district court also appointed different co-lead counsel to pursue claims on behalf of the direct purchaser plaintiffs.

Pursuant to the court's briefing schedule, both the direct and indirect purchaser plaintiffs filed second amended complaints. Plaintiffs' Second Amended Indirect Purchaser Class Action Complaint ("Original Second Amended Complaint") asserted claims predicated not only on state antitrust and unfair competition laws, as their first amended complaint had done, but also on the Sherman Act. The direct purchaser plaintiffs' second amended complaint alleged violations of federal antitrust laws only. As clarified in a subsequent stipulation made to the district court, however, the direct purchaser plaintiffs' second amended complaint included within its pro-

---

1980) ("[A] court may take judicial notice of its own records in other cases, as well as the records of an inferior court in other cases.").

posed class "persons who qualify as direct purchasers under *Illinois Brick* [*Co. v. Illinois*, 431 U.S. 720 (1977)] or who would be deemed to be falling within an exception under *Illinois Brick* so that they have a claim as a direct purchaser under the Sherman Act." Stated another way, the direct purchasers' consolidated complaint sought to pursue federal claims for direct purchasers as well as for indirect purchasers who had standing under an *Illinois Brick* exception.

Three days after Plaintiffs filed their Original Second Amended Complaint, the direct purchaser plaintiffs submitted a proposed case management order ("CMO") intended to encompass all actions asserting Sherman Act claims. The CMO asserted that it would apply to:

> all pending actions and all actions later instituted in, removed to, or transferred to this Court as part of MDL No. 1891 or [that] are otherwise related to these actions (collectively, "the Consolidated Actions") including, but not limited to, actions asserting claims under Section 1 of the Sherman Act, 15 U.S.C. § 1, or foreign law for alleged fixing of prices for passenger air transportation to or from the Republic of Korea, except for actions brought on behalf of indirect purchasers of passenger air transportation under the laws of the several states of the United States, such as *Soon Ja Chun, et. al v. Korean Air Lines Co., Ltd., et al.*, Case No. CV 07-06542 SJO (AGRx). All such indirect purchaser actions shall be coordinated for pretrial purposes with the Consolidated Actions and subject to a separate case management order.

Plaintiffs objected to the CMO on procedural and substantive grounds, contending that they had not been consulted before its filing and that, in light of their Original Second Amended Complaint's reassertion of federal claims, it "potentially

usurp[ed] the role of interim class counsel for indirect purchasers." Plaintiffs filed their own proposed case management order ("proposed CMO") to govern actions of indirect purchaser plaintiffs.

Through a minute order, the district court approved the direct purchaser plaintiffs' CMO, rejected Plaintiffs' proposed CMO, and clarified its intentions regarding the appointment of interim lead counsel, explaining that it "intended that the Indirect Purchaser Plaintiffs would only represent those claims arising under state law." The district court struck Plaintiffs' Original Second Amended Complaint and directed Plaintiffs to file an amended complaint consistent with its order.

Plaintiffs thereafter filed a revised complaint ("Second Amended Complaint") asserting only state law claims, based on California unfair competition and unfair business practices laws, as well as on similar laws of nineteen other states and the District of Columbia. Defendants moved to dismiss the complaint, arguing, among other things, that Plaintiffs' claims for relief arising under state law are preempted by the express preemption provision of the Airline Deregulation Act of 1978 ("ADA"), 49 U.S.C. § 41713. Plaintiffs opposed the motion and later requested leave to reinstate their Sherman Act Claims.

The district court denied Plaintiffs' request to add Sherman Act claims, reaffirming its previous order "that the Indirect Purchaser Plaintiffs may only represent those claims arising under state law." The next day, the district court granted Defendants' motion to dismiss on preemption grounds. In a footnote, the court reiterated that it had denied Plaintiffs' request for leave to add claims under the Sherman Act on the basis of its "conclu[sion] that Plaintiffs may only assert state law claims."

Plaintiffs timely appeal the dismissal of their California state law claims, arguing that they are not preempted by federal law.[2] Plaintiffs also argue that denial of leave to amend was error and that they should be allowed to reinstate their federal antitrust claims on behalf of indirect ticket purchasers.

## II

We first address Plaintiffs' argument that their California state law claims are not preempted by federal law. The district court held that Plaintiffs' state law claims were preempted by the ADA, which provides that a "[s]tate . . . may not enact or enforce a law, regulation, or other provision having the force and effect of law related to a price, route, or service of an air carrier that may provide air transportation under this subpart."[3] 49 U.S.C. § 41713(b)(1). Plaintiffs contend that Congress statutorily defined "air carrier" and "foreign air carrier" as mutually exclusive terms and, therefore, that Congress's use of the term "air carrier" in the preemption provision means that foreign air carriers are excluded from its reach. *See id.* §§ 40102(a)(2), (21). They also contend that their state law claims are not "related" to the price of an air carrier and therefore are not preempted. We disagree.

## A

**[1]** Defendants argue that, for the purposes of the ADA preemption provision, Congress intended the term "air carrier" to encompass all air carriers, whether domestic or foreign,

---

[2]Plaintiffs do not mention on appeal the other nineteen state and District of Columbia laws listed in their Second Amended Complaint and have therefore waived any argument related to state laws other than those of California. *See Dream Games of Ariz., Inc. v. PC Onsite*, 561 F.3d 983, 994-95 (9th Cir. 2009) (stating that matters not raised in appellant's opening brief are waived).

[3]We review de novo both a district court's dismissal of a case on federal preemption grounds and a district court's interpretation of federal statutes. *Peck v. Cingular Wireless, LLC*, 535 F.3d 1053, 1055 (9th Cir. 2008).

consistent with the term's ordinary meaning. In arguing that the provision has a more limited scope, Plaintiffs stress that Congress has defined the term "air carrier" as "a citizen of the United States undertaking by any means, directly or indirectly, to provide air transportation," 49 U.S.C. § 40102(a)(2), and the term "foreign air carrier" as "a person, not a citizen of the United States, undertaking by any means, directly or indirectly, to provide foreign air transportation," *id.* § 40102(a)(21).[4] Plaintiffs contend that Congress intended the terms "air carrier" and "foreign air carrier" to refer to different entities and that it consistently employed those terms for distinct uses. In this regard, they note that, in fifty-one separate provisions of law, Congress used both terms to make clear that a provision applies to both types of carriers. *See, e.g., id.* § 40101(a)(10) (using the phrase "air carrier or foreign air carrier"); *id.* § 40109(a) (using the phrase "air carriers and foreign air carriers"). Plaintiffs assert that, because Congress used only the term "air carrier" in the preemption provision, it did not intend to preempt state regulation of "foreign air carrier[s]."

[2] An examination of the FAA shows that Congress's use of the term "air carrier" throughout the Act does not always correspond with that term's statutory definition and that "air carrier" is sometimes used to refer generally to both domestic and foreign airlines. For example, 49 U.S.C. § 44901(i) refers to "an air carrier providing air transportation under a certificate . . . or a permit." Only a domestic "air carrier" provides air transportation under a certificate, and only a "foreign air carrier" provides air transportation under a permit. *See id.* §§ 41102, 41302. Thus, the term "air carrier" in this context

---

[4] A domestic "air carrier" may also provide foreign air transportation services. For example, American Airlines, a domestic "air carrier," may fly routes both within the United States and between the United States and a foreign country. A "foreign air carrier" is restricted, however, to flying routes between the United States and a foreign destination; it is not allowed to fly routes between U.S. destinations.

refers to both a domestic "air carrier" and a "foreign air carrier." Also, 49 U.S.C. § 44940(a)(2)(B)(ii) refers to "an air carrier described in subparagraph (A)," which in turn covers both "air carriers and foreign air carriers," *see id.* § 44940(a)(2)(A). Likewise, many of the FAA's subsections contain only the term "air carrier" in their titles even though their content plainly regulates both domestic and foreign operators. *See id.* § 40129(f) (subsection entitled "Eligibility of air carriers" refers to "air carrier[s]" and "foreign air carrier[s]" participating in collaborative decisionmaking pilot programs); *id.* § 44940(a)(2) (subsection entitled "Air carrier fees" authorizes the Secretary of Transportation to impose certain fees on "air carriers and foreign air carriers"); *see also Carter v. United States*, 530 U.S. 255, 267 (2000) (noting that title of statute may be of use when it sheds light on an ambiguous phrase). Congress's occasional use of the term "air carrier" to include "foreign air carrier" counsels strongly that the meaning of "air carrier" is ambiguous in the ADA's statutory preemption provision.

## (i)

**[3]** "Once it is established that [a statutorily defined term has different meanings in different sections], the term standing alone is necessarily ambiguous and each section must be analyzed to determine whether the context gives the term a further meaning that would resolve the issue in dispute." *Robinson v. Shell Oil Co.*, 519 U.S. 337, 343-44 (1997).[5] Here,

---

[5] Such a section-by-section analysis is appropriate in light of the drafting history of the FAA. Section 101 of the Federal Aviation Act of 1958 defined "air carrier" as being a U.S. citizen "unless the context otherwise requires." Pub. L. No. 85-726, 72 Stat. 731 (1958). The 1994 re-enactment of Title 49 and its slight amendment, which removed this "context" proviso, was not to be construed as making a substantive change in the law, *see* S. Rep. No. 103-265, at 5 (1994) ("[T]his bill makes no substantive change in the law."), so considering context in construing the meaning of "air carrier" is consistent with Congress's intent in drafting the statute. *See Port Auth. of N.Y. & N.J. v. Dep't of Transp.*, 479 F.3d 21, 32 (D.C. Cir. 2007).

the context in which the term appears in the preemption provision indicates that Congress intended that it apply to all air carriers and not only to domestic carriers.[6] The preemption provision prohibits state regulation of "an air carrier that may provide air transportation under this subpart." 49 U.S.C. § 41713(b)(1). The use of the modifying phrase "that may provide air transportation under this subpart" indicates that the term "air carrier" is defined in a particular way in this provision. *See, e.g.*, *Nw. Forest Res. Council v. Glickman*, 82 F.3d 825, 834 (9th Cir. 1996) ("We have long followed the principle that [s]tatutes should not be construed to make surplusage of any provision." (internal quotation marks omitted) (alteration in original)). Because the subpart to which the phrase refers, entitled "Economic Regulation," has provisions regulating both domestic and foreign air carriers, a sensible reading of the preemption provision implies that "air carrier" was intended to have its broader and ordinary meaning in this section of the statute. *See* 49 U.S.C. § 41101 et seq., Subtitle VII, Part A, Subpart II.

Plaintiffs argue, however, that the modifying phrase is consistent with their reading of "air carrier" and that the provision prohibits state regulation of a domestic "air carrier" that has permission to provide air transportation. Under Plaintiffs' interpretation, states could regulate a domestic "air carrier" that does not have permission to provide air transportation— that is, a carrier flying illegally without a certificate from the Department of Transportation. Plaintiffs' interpretation is neither reasonable nor convincing. If accepted, it would mean that Congress wanted states to be able to regulate the prices and services of domestic air carriers that were not at all autho-

---

[6]We decline to apply a general presumption against preemption here because the ADA preemption provision involves preclusion of state regulation in "an area where there has been a history of significant federal presence," namely navigable airspace. *United States v. Locke*, 529 U.S. 89, 108 (2000); *see Skysign Int'l, Inc. v. City & Cnty. of Honolulu*, 276 F.3d 1109, 1115-16 (9th Cir. 2002).

rized to provide air transportation. It is unlikely that Congress would have created an explicit exception to allow state regulation of the prices and services of domestic air carriers that are not authorized to provide air transportation. *See Armstrong Paint & Varnish Works v. Nu-Enamel Corp.*, 305 U.S. 315, 333 (1938) ("[T]o construe statutes so as to avoid results glaringly absurd, has long been a judicial function.").

**(ii)**

A review of the ADA preemption provision's purpose and legislative history similarly indicates that Congress intended to prevent states from regulating foreign air carriers. *See Cosmetic Ideas, Inc. v. IAC/InteractiveCorp.*, 606 F.3d 612, 618 (9th Cir. 2010) ("When statutory language proves unclear, we work to discern its meaning by looking to the broader context of the statute as a whole and the purpose of the statute." (internal quotation marks omitted)); *Merkel v. Comm'r of Internal Revenue*, 192 F.3d 844, 848 (9th Cir. 1999) ("[I]f the statute is ambiguous, we consult the legislative history, to the extent that it is of value, to aid in our interpretation." (internal quotation mark omitted)).

**[4]** The purpose of the ADA's preemption provision is "[t]o ensure that the [s]tates would not undo federal deregulation with regulation of their own." *Morales v. Trans World Airlines, Inc.*, 504 U.S. 374, 378 (1992). "In addition to protecting consumers, federal regulation insures a uniform system of regulation and preempts regulation by the states" in a field where state-based variations "would be confusing and burdensome to airline passengers, as well as to the airlines." H.R. Rep. 98-793, at 4 (1984). This purpose would be undermined if states could regulate foreign air carriers. Reading the statutory scheme to preempt state regulation of domestic air carriers while permitting such regulation of foreign air carriers would create a confusing patchwork of regulations for airline passengers to navigate, as their decision to purchase tickets for international flights would carry different conse-

quences depending on whether they bought tickets from a U.S.-based carrier or an airline headquartered in a foreign country. Such a result would not be consonant with Congress's express purpose in enacting the statute.

The legislative history behind the ADA also demonstrates that Congress intended to preserve its authority to regulate the airline industry by prohibiting states from regulating all air carriers, both domestic and foreign. As originally enacted in the context of the deregulation of domestic air transportation, *see Sanchez v. Aerovias De Mexico, S.A. de C.V.*, 590 F.3d 1027, 1030 (9th Cir. 2010), the ADA's preemption provision prohibited state regulation of carriers with authority "to provide interstate air transportation," 49 U.S.C. App. § 1305(a)(1) (1978).[7] Then, as now, only domestic air carriers could provide "interstate air transportation." Following on the heels of the ADA, Congress extended deregulation to foreign air transportation through the International Air Transportation Competition Act of 1979 ("IATCA"), Pub. L. No. 96-192, 94 Stat. 35 (1980). With almost identical language to that used in the domestic deregulation context, the IATCA sought to promote competition in international air transportation through "[t]he placement of maximum reliance on competitive market forces and on actual and potential competition." *Id.* § 102(a)(4).

[5] The Civil Aeronautics Board Sunset Act of 1984 ("Sunset Act"), Pub. L. No. 98-443, 98 Stat. 1703 (1984), amended the ADA's preemption provision by deleting the term "interstate," so that preemption extended to "any air carrier having authority . . . to provide air transportation." *Id.* The

---

[7]As enacted in 1978, the preemption provision of the ADA read: "[N]o State . . . shall enact or enforce any law, rule, regulation, standard, or other provision having the force and effect of law relating to the rates, routes, or services of any air carrier having authority under subchapter IV of this chapter to provide interstate air transportation." 49 U.S.C. App. § 1305(a)(1) (1978).

Sunset Act was born out of a belief that, as the Congressional deregulatory effort was coming to a close, "legislation [was] needed to clarify the ADA and to ensure that some limited but highly important [Civil Aeronautics Board ("CAB")] functions, such as consumer protection, [would] continue to be carried out by other agencies after CAB sunset." H.R. Rep. 98-793, at 2. It conferred upon the Department of Transportation ("DOT") the CAB's authority "to prevent unfair or deceptive practices or unfair methods of competition in air transportation . . . [and] to ensure that carriers providing interstate or overseas air transportation [were] fit, willing, and able to perform." *Id.* at 13. "[I]n administering these responsibilities DOT [was to] preserve the competitive direction adopted in the [ADA] and the [IATCA]." *Id.* at 8. As it is clear that the ramifications of the IATCA were in the minds of the Sunset Act's drafters, the Sunset Act's deletion of the limiting term "interstate" from the ADA preemption provision leads us to conclude that Congress intended to expand the ADA's preemptive scope to cover state regulation of "foreign air carrier[s]."[8]

### (iii)

The applicable case law supports our determination that state law claims are preempted. Although few courts have explicitly discussed the issue raised by Plaintiffs, numerous courts—including the Supreme Court—have applied the provision to foreign carriers without reservation. *See, e.g.*, *Morales*, 504 U.S. at 383-85 (concluding that state law claims were preempted with respect to all respondents, including foreign air carriers); *Buck v. Am. Airlines, Inc.*, 476 F.3d 29, 36 (1st Cir. 2007) (concluding that preemption prevented state law

---

[8]Subsequent modification of the preemption provision's language does not cast doubt on this conclusion because, when Congress revised the preemption provision in 1994 to its current form, it "intended the revision to make no substantive change." *Am. Airlines, Inc. v. Wolens*, 513 U.S. 219, 223 n.1 (1995); *see also* S. Rep. No. 103-265, at 5 (1994).

claims against six foreign air carriers); *Read-Rite Corp. v. Burlington Air Express, Ltd.*, 186 F.3d 1190, 1197 (9th Cir. 1999) (concluding state law claim for cargo damage preempted against foreign air carrier).

The few courts that have squarely considered the issue have determined that the preemption provision applies equally to domestic and foreign air carriers. In addition to the district court's persuasive reasoning in this case,[9] we find instructive the reasoning of the district court in *Lawal v. British Airways, PLC*, 812 F. Supp. 713 (S.D. Tex. 1992). There, the district court analyzed the pre-1994 language of the preemption provision, which provided for preemption of state laws applied to "any air carrier having authority . . . to provide air transportation." *Id.* at 717 (emphasis omitted). The court concluded that "the prefatory use of the word 'any' would be mere surplusage" if the provision were read to apply to only a domestic "air carrier" and that the modifying language extended to "various types of carriers, including foreign air carriers." *Id.* at 717-18. Because the 1994 revision to the preemption provision was intended to effect no substantive change, *see supra* note 8, such reasoning strengthens our decision that the preemption provision is not limited to domestic air carriers.

### (iv)

Our conclusion that the ADA precludes state regulation of both domestic and foreign air carriers is reinforced by an important pragmatic concern: If the preemption provision only sheltered domestic air carriers, it would be more difficult for foreign carriers to enter the U.S. market for international

---

[9]The district court reasoned that "air carrier," as modified by the phrase "that may provide transportation under this subpart" was "not immune to a construction that would include 'foreign air carriers,' " and it noted the uniformity of opinion applying the ADA preemption provision against foreign air carriers. Stating that there were no compelling policy reasons for limiting preemption only to claims against domestic air carriers, the district court held that the provision extended to foreign carriers.

flights. This added burden would be to the detriment of U.S. consumers, who benefit from price competition between as many carriers as possible. Moreover, discriminating against foreign carriers would be contrary to our country's general preference for free trade. *See* U.S. Dep't of Commerce, Strategic Plan: FY 2007-FY 2012, 7-8, *available at* http://www.osec.doc.gov/bmi/Budget/07strplan/DOC07 strplan.pdf ("The [U.S.] Department [of Commerce] is committed to free trade by opening and expanding foreign markets for U.S. goods and services and improving U.S. export performance. . . . Unfair trade negatively affects the ability of U.S. firms to sell overseas and impacts the U.S. jobs that depend on the Nation's international trade."). If state regulation makes it harder for foreign air carriers to compete with domestic carriers, U.S.-based airlines might soon encounter additional, retaliatory barriers when they try to sell tickets abroad.

## (v)

Finally, the approach championed by Plaintiffs would discriminate against foreign air carriers in favor of domestic ones, contrary to U.S. treaty obligations mandating nondiscrimination. *See, e.g.*, Convention on International Civil Aviation, art. 11, Dec. 7, 1944, 61 Stat. 1180, 15 U.N.T.S. 295 (providing for application of laws and regulation "without distinction as to nationality" of airlines of signatory states); U.S.-Korea Air Transport Agreement, art. 11, June 9, 1998, State Dept. No. 98-111, 1998 WL 468488 ("Each Party shall allow a fair and equal opportunity for the designated airlines of both Parties to compete in providing the international air transportation governed by this Agreement."); Treaty of Friendship, Commerce and Navigation, U.S.-Korea, art. 1, Nov. 28, 1956, 8 U.S.T. 2217 ("Each Party shall at all times accord equitable treatment to the persons, property, enterprises and other interests of nationals and companies of the other Party."). This result would offend the longstanding principle that statutes should be construed in accordance with international law. *See*

*Murray v. The Schooner Charming Betsy*, 6 U.S. (2 Cranch) 64, 118 (1804) ("[A]n act of Congress ought never to be construed to violate the law of nations if any other possible construction remains . . . .").

**[6]** For these reasons, we hold that the ADA's preemption of state regulation covers regulation of all air carriers, whether domestic or foreign.

## B

**[7]** We further conclude that Plaintiffs' state law claims, alleging that Defendants engaged in price-fixing in violation of the California Business and Professions Code and unfair competition laws, are "related to a price" of an air carrier for purposes of preemption under the ADA. 49 U.S.C. § 41713(b)(1). The words of the ADA preemption provision "express a broad pre-emptive purpose," such that "[s]tate enforcement actions having a connection with, or reference to, airline 'rates, routes, or services' are pre-empted." *Morales*, 504 U.S. at 383-84. The district court accurately concluded that Plaintiffs seek "to regulate the manner by which Defendants set fares, or components of fares, for air transportation services." Because Plaintiffs allege a price-fixing conspiracy, their claims are plainly related to a price of an air carrier and consequently are preempted.

Contrary to Plaintiffs' assertion, it is immaterial that the state laws do not interfere with the purposes of the federal statute or that they might be consistent with promoting competition and deregulation. The Supreme Court has rejected this argument. *Id.* at 386-87 (stating that, for the purpose of the ADA preemption analysis, the consistency of state and federal laws is "beside the point"). Recently, in *Rowe v. New Hampshire Motor Transportation Ass'n*, 552 U.S. 364 (2008), the Supreme Court reiterated that a state law "*having a connection with, or reference to*" rates, routes, or services is preempted and that "it makes no difference whether a state law

is consistent or inconsistent with federal regulation." *Id.* at 370-71 (internal quotation marks omitted).

Plaintiffs unsuccessfully argue that the Supreme Court's decision to limit the scope of the term "relate to" in the ERISA preemption provision, *see De Buono v. NYSA-ILA Med. & Clinical Servs. Fund*, 520 U.S. 806, 812-13 (1997), shows that it also intended to limit the ADA preemption provision. The Supreme Court's 2008 *Rowe* decision held that "it makes no difference whether a state law is 'consistent' or 'inconsistent' with federal regulation." 552 U.S. at 371. Although the Court was interpreting the Federal Aviation Administration Act, it looked to the ADA's "identical" preemption provision for guidance. *Id.* at 370. If the Supreme Court intended to narrow the scope of these preemption provisions because of its ERISA decisions, it could have done so in *Rowe*, but it did not. *See Agostini v. Felton*, 521 U.S. 203, 237 (1997) (" 'If a precedent of [the Supreme] Court has direct application in a case, yet appears to rest on reasons rejected in some other line of decisions, the Court of Appeals should follow the case which directly controls, leaving to [the Supreme] Court the prerogative of overruling its own decisions.' " (quoting *Rodriguez de Quijas v. Shearson/Am. Express, Inc.*, 490 U.S. 477, 484 (1989) (alteration omitted)); *Musladin v. Lamarque*, 555 F.3d 830, 837 (9th Cir. 2009) ("The Supreme Court has made clear that the circuit courts must follow Supreme Court precedent until the Supreme Court itself declares it no longer binding."); *United Airlines, Inc. v. Mesa Airlines, Inc.*, 219 F.3d 605, 608 (7th Cir. 2000) ("[I]f developments in pension law have undercut holdings in air-transportation law, it is for the Supreme Court itself to make the adjustment. Our marching orders are clear: follow decisions until the Supreme Court overrules them.").

We conclude that Plaintiffs' state law claims are preempted, and we affirm the district court's order dismissing them.

## III

We next address Plaintiffs' challenge to the district court's denial of leave to amend their complaint to assert previously abandoned federal claims.[10] In arguing that the district court erred in refusing to let them add federal antitrust claims, Plaintiffs challenge two separate decisions of that court: (1) its adoption of the direct purchaser plaintiffs' CMO in its March 14, 2008 order, and (2) its refusal to allow Plaintiffs to add federal antitrust claims via amendment.[11] Plaintiffs contend that the district court erred in assigning responsibility for litigating purported indirect purchaser claims to direct purchaser plaintiffs' counsel because such counsel are incapable of adequately pursuing the interests of both direct and indirect purchasers, given an inherent conflict of interest between the two groups. Plaintiffs argue that they instead should have been allowed to bring federal antitrust claims on behalf of indirect purchaser plaintiffs. Defendants, for their part, portray both of the district court's decisions as unreviewable interlocutory case management orders whose sole effect is to permit different counsel to pursue Plaintiffs' claims. They argue that Plaintiffs' federal claims are still alive—even though their case has been dismissed—and that the district court may revisit and reassess problems associated with

---

[10]Plaintiffs characterize their claim in this regard as a claim that the district court should have allowed them to "reinstate" their federal claims. However, as there is no indication that Plaintiffs' initial abandonment of their federal claims was not done voluntarily, we consider the issue as a denial of a proposed amendment of Plaintiffs' complaint.

[11]We review a denial of leave to amend for abuse of discretion. *Kaplan v. Rose*, 49 F.3d 1363, 1370 (9th Cir. 1994). "A district court abuses its discretion if it does not apply the correct law or if it rests its decision on a clearly erroneous finding of a material fact." *Casey v. Albertson's Inc.*, 362 F.3d 1254, 1257 (9th Cir. 2004). A review for abuse of discretion requires looking at both whether the trial court applied the correct legal rule, and, if so, whether application of the rule was illogical, implausible, or without support in the record. *See United States v. Hinkson*, 585 F.3d 1247, 1251 (9th Cir. 2009) (en banc).

potential conflicts of interest, if necessary, as the litigation progresses.

We have jurisdiction to review the district court's denial of leave to amend pursuant to 28 U.S.C. § 1291. Although such orders are usually not immediately appealable, *see, e.g.*, *Skoog v. Cnty. of Clackamas*, 469 F.3d 1221, 1228-29 (9th Cir. 2006), the district court's denial of leave to amend to add federal claims, in conjunction with its dismissal of Plaintiffs' state law claims, effectively extinguished Plaintiffs' entire case, *see, e.g.*, *Watson v. Weeks*, 436 F.3d 1152, 1155 (9th Cir. 2006) (finding jurisdiction to review denial of leave to amend where entire complaint was dismissed). The district court's denial of leave to add Sherman Act claims thus "end-[ed] the litigation on the merits and [left] nothing for the court to do but execute judgment," rendering the decision final and reviewable. *Coopers & Lybrand v. Livesay*, 437 U.S. 463, 467 (1978). We conclude that the district court erred in denying Plaintiffs leave to amend based on its determination that other counsel would pursue the federal antitrust claims. However, we lack jurisdiction at this juncture to assess the wisdom of the district court's decision to place pretrial responsibility for both direct and indirect purchaser claims in the hands of counsel for direct purchaser plaintiffs only.

## A

Defendants contend that Plaintiffs' claims survive and are simply being pursued by different counsel. They therefore argue that Plaintiffs' appeal of the district court's denial of leave to amend is premature. But Defendants misapprehend the nature of multidistrict litigation.

The MDL process seeks to "promote the just and efficient conduct" of "civil actions involving one or more common questions of fact [that] are pending in different districts" by permitting their transfer to a single district for "coordinated or consolidated pretrial proceedings." 28 U.S.C. § 1407(a). To

promote efficiency in a context involving the juggling of dozens or thousands of independent cases, a "district court needs to have broad discretion to administer the proceeding as a whole." *In re Phenylpropanolamine (PPA) Prods. Liab. Litig.*, 460 F.3d 1217, 1232 (9th Cir. 2006) (hereinafter "*In re PPA*"). A district judge exercising authority over cases transferred for pretrial proceedings "inherits the entire pretrial jurisdiction that the transferor district judge would have exercised if the transfer had not occurred." 15 Charles Alan Wright, Arthur R. Miller & Edward H. Cooper, *Federal Practice & Procedure* § 3886 (3d ed. 2010). Such authority is broad and encompasses the power to decide dispositive pretrial motions. *In re PPA*, 460 F.3d at 1231 (stating that a transferee judge's power "includes authority to decide all pretrial motions such as motions to dismiss, motions for summary judgment, motions for involuntary dismissal under Rule 41(b), motions to strike an affirmative defense, and motions for judgment pursuant to a settlement"); *see In re Patenaude*, 210 F.3d 135, 144 (3d Cir. 2000).

Transferee courts have handled such procedural matters as dismissal of original complaints, filing of amended omnibus complaints, and resolution of motions. *Minisan v. Danek Med., Inc.,* 79 F. Supp. 2d 970, 971 (N.D. Ind. 1999). A transferee court may require parties to file consolidated amended complaints superseding original ones. *Armstrong v. LaSalle Bank Nat'l Ass'n*, 552 F.3d 613, 614 (7th Cir. 2009). A transferee court may rule on pretrial motions. *In re Eli Lilly & Co., Prozac Prods. Liab. Litig.,* 789 F. Supp. 1448, 1450 (S.D. Ind. 1992). It may enforce venue requirements. *In re Tax Refund Litig.*, 723 F. Supp. 922, 924 (E.D.N.Y. 1989). It may require individuals to attend settlement conferences. *In re Air Crash Disaster at Stapleton Int'l Airport, Denver, Colo., on Nov. 15, 1987*, 720 F. Supp. 1433, 1436 (D. Colo. 1988). It may permit amendment or adjustment of pleadings. *Sentner v. Amtrak*, 540 F. Supp. 557, 558 (D.N.J. 1982). It may handle and resolve discovery motions, including those involving scope of discovery, appropriateness of protective orders or

sanctions, and regulation of depositions. *See generally In re Flat Glass Antitrust Litig.*, 288 F.3d 83 (3d Cir. 2002); *In re Burlington N., Inc.*, 679 F.2d 762 (8th Cir. 1982)*; In re Vioxx Prods. Liab. Litig.*, 501 F. Supp. 2d 789 (E.D. La. 2007); *In re Air Crash at Charlotte, N.C. on July 2, 1994*, 982 F. Supp. 1052 (D.S.C. 1995); *Meeder v. Superior Tube Co.*, 72 F.R.D. 633 (W.D. Pa. 1976).

We confirm the general rule that, in multidistrict litigation, a transferee judge can handle all types of pretrial matters that otherwise would have been handled by the transferor court. A corollary to this principle is that the MDL transferee court is generally bound by the same substantive legal standards, if not always the same interpretation of them, as would have applied in the transferor court.[12] However, the district court's jurisdiction as an MDL transferee court is generally coextensive with pretrial proceedings. As a result, a district court does not have authority to transfer a case to itself for trial, *Lexecon Inc. v. Milberg Weiss Bershad Hynes & Lerach*, 523 U.S. 26, 28 (1998), nor may it consolidate actions for all purposes, as might be proper in other circumstances pursuant to Federal Rule of Civil Procedure 42, *see* Wright et al., *Federal Practice & Procedure* § 3866. Within the context of MDL proceedings, individual cases that are consolidated or coordinated for pretrial purposes remain fundamentally separate actions,

---

[12]*See, e.g.*, *Toll Bros. v. Dryvit Sys., Inc.*, 432 F.3d 564, 568 n.4 (4th Cir. 2005) ("When considering questions of state law, . . . the transferee court must apply the state law that would have applied to the individual cases had they not been transferred for consolidation." (internal quotation marks omitted) (omission in original)); *Menowitz v. Brown*, 991 F.2d 36, 40 (2d Cir. 1993) ("[A] transferee federal court should apply its interpretations of federal law, . . . . [but] applies the substantive state law, including choice-of-law rules, of the jurisdiction in which the action was filed."); *In re Korean Air Lines Disaster of Sept. 1, 1983*, 829 F.2d 1171, 1176 (D.C. Cir. 1987) ("[T]he law of a transferor forum [on a federal question] . . . merits close consideration, but does not have stare decisis effect in a transferee forum situated in another circuit.").

intended to resume their independent status once the pretrial stage of litigation is over.[13]

In addressing motions to amend brought in the context of multidistrict litigation, courts have proceeded in a manner that respects these principles. The substantive rules governing a district court's consideration of a motion to amend are the same as those for ordinary litigation on an ordinary docket. *See, e.g.*, *Khulumani v. Barclay Nat'l Bank Ltd.*, 504 F.3d 254, 260 (2d Cir. 2007) (vacating denial of motion to amend where district court's decision was predicated on legal error); *In re Ford Motor Co. Ignition Switch Prods. Liab. Litig.*, 39 F. Supp. 2d 458, 467 (D.N.J., 1999) (assessing MDL plaintiffs' motion for leave to file an amended complaint under standard discretionary considerations); *In re Brand Name Prescription Drugs Antitrust Litig.*, 177 F.R.D. 414, 419 (N.D. Ill. 1997) (same). There might be room for some slight variations in approach to applying the standards for amendment, as we have noted in the context of motions to dismiss. *See In re PPA*, 460 F.3d at 1222 ("[C]onsiderations that inform the exercise of discretion in multidistrict litigation may be somewhat different, and may tip the balance somewhat differently, from ordinary litigation on an ordinary docket."). Still, the basic ground rules for assessing motions for leave to amend, including the instruction of Federal Rule of Civil Pro-

---

[13]Where, as here, the particular case at issue is initiated in the transferee court's district, the district court's jurisdiction is not always similarly circumscribed to purely pretrial proceedings. *See In re Bridgestone/Firestone, Inc., Tires Prods. Liab. Litig.*, 333 F.3d 763, 767 (7th Cir. 2003) ("Because the decision stemmed from a complaint filed in the Southern District of Indiana, . . . the district court had original jurisdiction and was not acting as a transferee court under 28 U.S.C. § 1407 with respect to this complaint."). In such a case, the district court's jurisdiction beyond pretrial matters is part of its original jurisdiction, not the MDL jurisdiction. But considerations that animate the restrictions placed on a transferee court's exercise of jurisdiction over its MDL docket—including the principle that individual cases remain separate actions despite being coordinated or consolidated for pretrial purposes—do not dissipate because a particular case was filed in the MDL's home district.

cedure 15 ("Rule 15") that amendments should be freely given, may not be tossed out the window in an MDL case.

**[8]** There is much, of course, that an MDL court can do in its sound discretion in order to manage multidistrict litigation effectively. It can designate a lead counsel. It can hold some cases in abeyance while proceeding with others. In discretionary matters going to the phasing, timing, and coordination of the cases, the power of the MDL court is at its peak. But when it comes to motions that can spell the life or death of a case, such as motions for summary judgment, motions to dismiss claims, or, as here, a motion to amend pleadings, it is important for the district court to articulate and apply the traditional standards governing such motions. A total disregard for the normal standards of assessing these critical motions would improperly subject MDL cases to different and ad hoc substantive rules.

Federal Rule of Civil Procedure 15(a)(2) provides that when a party moves to amend before trial, "[t]he court should freely give leave when justice so requires." District courts generally consider four factors in determining whether to deny a motion to amend: "bad faith, undue delay, prejudice to the opposing party, and the futility of amendment." *Kaplan v. Rose*, 49 F.3d 1363, 1370 (9th Cir. 1994); *see also Foman v. Davis*, 371 U.S. 178, 182 (1962) (stating that Rule 15(a)'s "mandate is to be heeded," and that "[i]n the absence of any apparent or declared reason . . . the leave sought should, as the rules require, be 'freely given.' ").

In this case, instead of considering the usual factors, the district court denied Plaintiffs leave to amend solely on the basis of an improper consideration, namely the court's intention "that the Indirect Purchaser Plaintiffs would only represent those claims arising under state law." The court essentially concluded that allowing Plaintiffs to add federal claims would be inconsistent with its prior CMO. But the district court's decision to allow Plaintiffs to bring only state law

claims misapprehends the separate and independent nature of Plaintiffs' case. Although a district court overseeing MDL proceedings has the authority to decide which law firm should serve as lead counsel for the purposes of *pretrial* proceedings, MDL proceedings do not expand the grounds for disposing of individual cases.

[9] By denying leave to amend on the basis of the court's prior CMO, the court applied an incorrect legal standard to Plaintiffs' motion. Such an error constitutes an abuse of discretion. *Casey v. Albertson's Inc.*, 362 F.3d 1254, 1257 (9th Cir. 2004) ("A district court abuses its discretion if it does not apply the correct law . . . ."). We therefore vacate the district court's denial of leave to amend and remand for an analysis of Plaintiffs' request for leave to add federal antitrust claims under the proper standard. *See Khulumani*, 504 F.3d at 260 (vacating denial of leave to amend and remanding, in MDL context).

**B**

In seeking review of the district court's denial of leave to amend their complaint, Plaintiffs also implicitly request that we review the district court's adoption of the direct purchaser plaintiffs' CMO and its rejection of Plaintiffs' proposed CMO.[14] Because these decisions governing case management do not represent final judgments on the merits, we lack jurisdiction to review them. 28 U.S.C. § 1291.

---

[14]Plaintiffs argue that the district court abused its discretion in denying leave to amend because it did not act to protect indirect purchaser absentee plaintiffs by allowing direct purchaser plaintiffs alone to maintain federal antitrust claims. It is not clear if Plaintiffs independently attack the district court's adoption of the CMO, as they seem to assume that the reinstatement of their federal claims would make them lead counsel for indirect purchaser plaintiffs during the pretrial stage of litigation. But because these decisions are procedurally and analytically distinct, we treat Plaintiffs' objections as posing a challenge to the district court's adoption of the CMO.

A district court's case management orders are generally not appealable on an interlocutory basis. *See Moglia v. Pac. Emp'rs Ins. Co. of N. Am.*, 547 F.3d 835, 838 (7th Cir. 2008) ("Treating case-management orders as injunctions would permit not one appeal per suit, but dozens, and make a mockery of the final-decision requirement."). The CMO at issue here is interlocutory because the district court retains the ability to modify it at any time. *See Z-Seven Fund, Inc. v. Motorcar Parts & Accessories*, 231 F.3d 1215, 1218-19 (9th Cir. 2000) (holding that an order designating a lead plaintiff is unappealable and interlocutory because it is "not a conclusive, immutable determination of the issue" since the district court might later change the lead plaintiff "consistent with [its] *continuing* duty to see that a class is adequately represented by counsel" (emphasis in original)). If permitted upon remand to reinstate their federal claims, Plaintiffs will be able to reassert their conflict of interest concerns at later stages of litigation, and the district court will be able to reassess its decisions in this regard.

There is another reason for declining to view the CMO as subject to interlocutory consideration. We have held that "only after assessing . . . the final judgment could an appellate court decide whether the client's rights had been prejudiced [by the appointment of certain counsel]." *In re Westwood Shake & Shingle, Inc.*, 971 F.2d 387, 390 (9th Cir. 1992) (internal quotation marks omitted) (alterations and omission in original)). If Plaintiffs' conflict of interest concerns have merit, an " 'opportunity for meaningful review will [not] perish' because [the] circuit court can conclude after trial that continued representation was prejudicial and can vacate judgment." *Id.* (quoting *Firestone Tire & Rubber Co. v. Risjord*, 449 U.S. 368, 377-78 (1981) (first alteration in original)).

We hold that decisions regarding the CMOs involved in this case are interlocutory. That the district court improperly based its denial of leave to amend on its decision that direct purchaser plaintiffs' counsel would represent indirect pur-

chaser plaintiffs suing under *Illinois Brick* exceptions does not render the CMOs themselves reviewable. Given our determination that the district court improperly denied leave to amend, no causal nexus remains between the challenged CMO and the dismissal of Plaintiffs' claims. We therefore decline to review the district court's adoption of the direct purchaser plaintiffs' CMO, and the court's rejection of Plaintiffs's proposed CMO, at this time.

## IV

For the foregoing reasons, the district court's order is AFFIRMED IN PART, VACATED IN PART, and REMANDED for further proceedings consistent with this opinion.

The parties shall bear their own costs on appeal.