**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

OREGON COAST SCENIC
RAILROAD, LLC, an Oregon
nonprofit corporation,
*Plaintiff-Appellant,*

v.

STATE OF OREGON DEPARTMENT
OF STATE LANDS; MARY M.
ABRAMS, Director of Department
of State Lands, in her official
capacity,
*Defendants-Appellees.*

No. 14-35414

D.C. No.
3:14-cv-00414-HZ

OPINION

Appeal from the United States District Court
for the District of Oregon
Marco A. Hernandez, District Judge, Presiding

Argued and Submitted October 5, 2016
Portland, Oregon

Filed November 23, 2016

Before: Sidney R. Thomas, Chief Judge, and Richard R.
Clifton and Jacqueline H. Nguyen, Circuit Judges.

Opinion by Chief Judge Thomas

# SUMMARY[*]

## Surface Transportation Board

Reversing the district court's judgment in favor of the State of Oregon Department of State Lands, which sought to enforce a state environmental law in connection with railroad repair work, the panel held that the federal Surface Transportation Board has exclusive jurisdiction over railroad repair work done at the direction of a federally regulated rail carrier but performed by a contractor rather than the carrier itself.

The plaintiff, a non-profit operator of tourist trains, had entered into an agreement with the Port of Tillamook Bay, a federally regulated railroad, to repair a railroad track. The plaintiff alleged that the Oregon law, known as a "removal-fill" law, was preempted by the Interstate Commerce Commission Termination Act, which governs federal regulation of railroads.

The panel held that the repair work done by the plaintiff under its agreement with the Port fell under the Board's jurisdiction because the work was done under the auspices of a federally regulated rail carrier and was sufficiently related to the provision of transportation over the interstate rail network. The Oregon law therefore was preempted as applied to this work. The panel reversed the district court's judgment and remanded for further proceedings with respect

---

[*] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

to preliminary and permanent injunctive relief and declaratory relief.

## COUNSEL

Martin E. Hansen (argued) and Sarah E. Harlos, Francis Hansen & Martin LLP, Bend, Oregon, for Plaintiff-Appellant.

Robert M. Wilsey (argued), Assistant Attorney General; Anna M. Joyce, Solicitor General; Ellen F. Rosenblum, Attorney General; Oregon Department of Justice, Salem, Oregon; for Defendants-Appellees.

## OPINION

THOMAS, Chief Judge:

This case presents the question whether the federal Surface Transportation Board ("the Board") has exclusive jurisdiction over railroad repair work done at the direction of a federally regulated rail carrier but performed by a contractor rather than the carrier itself. We conclude that it does, and we therefore reverse and remand.

I

The Oregon Coast Scenic Railroad ("Oregon Coast") is a non-profit corporation that operates tourist trains on a portion of track in Oregon that is owned by the Port of Tillamook Bay ("the Port"). The Port is a federally regulated railroad authorized by the Board. The Port operates freight trains; it formerly ran trains on the portion of the railroad used by

Oregon Coast, but in 2007 part of the track was damaged by a winter storm and freight traffic ceased on that portion of the track.

In 2012, Oregon Coast and the Port entered into a five-year agreement under which Oregon Coast would continue leasing this portion of the track, but instead of paying the Port for use of the track, Oregon Coast would instead use those funds "for deferred maintenance and upgrading of [the Port's] rail line and right-of-way." The agreement provided that Oregon Coast would be "solely responsible" for rehabilitation of the railway, track maintenance, and compliance with federal and state safety and maintenance requirements. The agreement contemplated that the repair work might re-establish the track's "connection to a mainline carrier providing service," and freight traffic might resume at some point. If and when that happened, the parties agreed to negotiate a modification to the agreement that would allow Oregon Coast to continue to run tourist trains alongside the Port's anticipated freight traffic.

Oregon Coast began repair work under this agreement in early 2014. On March 11, 2014, after approximately five weeks of work had been completed and two to four weeks of work remained, the State of Oregon's Department of State Lands ("the State") sent Oregon Coast a cease and desist order. The order alleged that Oregon Coast's repair work was violating a state "removal-fill law," which, among other things, requires a state permit for the removal of any amount of material from waters designated as Essential Salmonid Habitat. The State alleged that Oregon Coast was engaging in unpermitted "removal-fill activity" in or near an Essential Salmonid Habitat section of the Salmonberry River, and it contested Oregon Coast's assertion that federal law

preempted application of this state law to railroad repair work.

Oregon Coast filed a complaint in federal district court the following day, seeking declaratory and injunctive relief. Oregon Coast argued that the removal-fill law is preempted by the Interstate Commerce Commission Termination Act ("ICCTA"), 49 U.S.C. §§ 10101 *et seq.*, which governs federal regulation of railroads. Oregon Coast sought a permanent injunction and a determination that application of the state law is federally preempted; that enforcement of the removal-fill law constituted an impermissible burden on interstate commerce in violation of the Commerce Clause; and that enforcement of the law violated Oregon Coast's federal rights under 42 U.S.C. § 1983. Oregon Coast also immediately moved for a preliminary injunction against the law's enforcement.

The district court held a hearing on the preliminary injunction in April 2014. At the State's request, the district court consolidated the preliminary injunction hearing with a hearing on the merits; it then issued a single order on all of Oregon Coast's requested relief. The court concluded that the removal-fill law was not preempted because Oregon Coast's tourist train activities were not sufficiently related to interstate commerce to bring Oregon Coast within the exclusive federal jurisdiction provision of the ICCTA. The court also concluded that Oregon Coast's agreement with the Port was insufficient to establish federal preemption as to Oregon Coast on the basis of *the Port's* status as a federally licensed carrier. Having concluded that Oregon Coast's claims failed on the merits, the district court denied Oregon Coast's requests for preliminary and permanent injunctions and for declaratory relief, and it dismissed the case.

Oregon Coast appeals, challenging (1) the district court's conclusion that federal preemption does not apply to the repair work done by Oregon Coast; (2) its conclusion that Oregon Coast was not acting as an agent of the Port; and (3) its denial of Oregon Coast's requests for preliminary and permanent injunctions and declaratory relief. Oregon Coast presents a federal question by alleging that enforcement of the state removal-fill law is preempted by the federal ICCTA; thus the district court had subject matter jurisdiction under 28 U.S.C. § 1331. *See Indep. Training & Apprenticeship Program v. Cal. Dep't of Indus. Relations*, 730 F.3d 1024, 1031 (9th Cir. 2013) (citing *Shaw v. Delta Air Lines, Inc.*, 463 U.S. 85, 96 n.14 (1983)). We have jurisdiction over the appeal under 28 U.S.C. § 1291.

We review de novo a district court's decision granting or denying declaratory relief. *Wagner v. Prof'l Eng'rs in Cal. Gov't*, 354 F.3d 1036, 1040 (9th Cir. 2004). We review a district court's denial of a preliminary or permanent injunction for abuse of discretion. *All. for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1131 (9th Cir. 2011); *Cummings v. Connell*, 316 F.3d 886, 897 (9th Cir. 2003). In this context, "[a]n abuse of discretion will be found if the district court based its decision 'on an erroneous legal standard or clearly erroneous finding of fact.'" *Cottrell*, 632 F.3d at 1131 (quoting *Lands Council v. McNair*, 537 F.3d 981, 986 (9th Cir. 2008) (en banc)).

Because it is a question of law, we review de novo a district court's conclusion about the extent of federal preemption. *In re Korean Air Lines Co., Ltd.*, 642 F.3d 685, 691 n.3 (9th Cir. 2011). Here, because the district court's decisions on the preliminary injunction, permanent injunction, and declaratory relief all relied on the same

analysis of the preemption question, a legal error in that analysis would affect the court's decision on all three forms of requested relief.  We therefore focus our analysis on the district court's conclusion as to the federal preemption question.

## II

The ICCTA was passed in 1995, in part with the purpose of expanding federal jurisdiction and preemption of railroad regulation.  *See* H.R. Rep. No. 104-311 at 95 (1995) ("[C]hanges are made to reflect the direct and complete pre-emption of State economic regulation of railroads.").  In order for federal preemption to apply under the ICCTA, the activity in question must first fall within the statutory grant of jurisdiction to the Surface Transportation Board, one of several federal agencies charged with railroad regulation. 49 U.S.C. § 10501(a).  As modified by the ICCTA, 49 U.S.C. § 10501(a) provides in relevant part:

> (1) Subject to this chapter, the Board has jurisdiction over transportation by rail carrier that is–
>
> (A) only by railroad; or
>
> (B) by railroad and water [under specified circumstances].
>
> (2) Jurisdiction under paragraph (1) applies only to transportation in the United States between a place in–

(A) a State and a place in the same or another State as part of the interstate rail network . . . .

If the Board has jurisdiction under 49 U.S.C. § 10501(a), the question whether jurisdiction is *exclusive* — i.e., whether state regulation is preempted — is a separate question governed by 49 U.S.C. § 10501(b), which provides that "[t]he jurisdiction of the Board over . . . (1) transportation by rail carriers . . . and (2) the construction, acquisition, operation, abandonment, or discontinuance of spur, industrial, team, switching, or side tracks, or facilities, even if the tracks are located, or intended to be located, entirely in one State, is exclusive."

In short, under the factual scenario presented by this case, Board jurisdiction under § 10501(a) is a threshold question requiring that the disputed activity meet three statutory prongs:  it must be (1) "transportation" (2) "by rail carrier" (3) "as part of the interstate rail network." *Id.*  The parties do not dispute that the repair work done by Oregon Coast qualifies as "transportation," which the ICCTA defines as including any "property, facility, instrumentality, or equipment of any kind related to the movement of passengers or property, or both, by rail" as well as "services related to that movement." 49 U.S.C. § 10102(9).  The parties' central dispute focuses on the other two prongs of the jurisdiction analysis — that is, on whether the repair work can be considered work done "by rail carrier" through Oregon Coast's relationship with the Port, and whether maintenance work done on an intrastate section of track can be considered "part of the interstate rail network."   For the reasons described below, we answer both questions in the affirmative.

A

The ICCTA defines "rail carrier" as "a person providing common carrier railroad transportation for compensation." 49 U.S.C. § 10102(5). But the statute does not address whether, in the jurisdiction provision, the term "transportation by rail carrier" may include work actually performed by another party *under the auspices of* the rail carrier. Here, it is undisputed that the Port is a federally licensed and regulated rail carrier, authorized by the Board under the procedures set out in 49 U.S.C. § 10901. The State has conceded that the track repair work in this case would fall under the Board's jurisdiction if the Port were undertaking the repairs itself.[1] Instead, the Port has essentially hired Oregon Coast to do this maintenance work on its behalf during the five-year agreement; the Port is paying Oregon Coast in the form of free track use for the duration of the agreement. This leaves us with the question whether the Port somehow divested the Board of jurisdiction over the repairs by hiring Oregon Coast to perform the work on its behalf. We conclude that it did not.

The Board itself has considered this question in similar contexts, and its decisions are instructive here.[2] *See Ass'n of*

---

[1] In fact, the Port undertook very similar maintenance and repair work on almost the same segment of track in the mid-1990s. The Port hired a contractor to perform this work, and that contractor has testified that he completed the work under the auspices of the Port, without going through state permitting processes.

[2] Although the parties focus on whether an agency relationship was created under Oregon law, the question whether a federal statute grants jurisdiction over a particular activity is a question of federal law that does not depend on the contours of a particular state's agency law. *See, e.g.*,

*Am. R.R.s v. S. Coast Air Quality Mgmt. Dist.*, 622 F.3d 1094, 1097 (9th Cir. 2010) (drawing "guidance on the scope of ICCTA preemption from the decisions of the Surface Transportation Board . . . , to which we owe *Chevron* deference" (citing *DHX, Inc. v. Surface Transp. Bd.*, 501 F.3d 1080, 1086 (9th Cir. 2007))).  The Board's decisions show that work done by a non-carrier can be considered activity "by a rail carrier" if there is a sufficient degree of integration between the work done by the non-carrier and the authorized rail carrier's own operations.  *See, e.g.*, *City of Alexandria*, No. 35157, 2009 WL 381800, at *2 (S.T.B. Feb. 17, 2009); *Town of Babylon*, No. 35057, 2008 WL 275697, at *3 (S.T.B. Feb. 1, 2008); *Hi Tech Trans, LLC*, No. 34192, 2003 WL 21952136, at *4 (S.T.B. Aug. 14, 2003).

The Board's decisions emphasize that this question is a "case-by-case, fact-specific determination." *City of Alexandria*, 2009 WL 381800, at *2.  Factors considered by the Board include the degree of control exercised by the carrier over the non-carrier's operations, the involvement of the carrier in day-to-day operations, the structure of payments and cost agreements, and other terms of the agreement between the carrier and the non-carrier.  *Id.*  The Board weighs these factors to determine whether the non-carrier's activities are "an integral part of [the rail carrier's] provision of transportation by rail carrier."  *Hi Tech*, 2003 WL 21952136, at *4.

---

*Ass'n of Am. R.R.s v. S. Coast Air Quality Mgmt. Dist.*, 622 F.3d 1094, 1096–98 (9th Cir. 2010) (analyzing the issue of Board jurisdiction and preemption under federal law); *City of Auburn v. United States*, 154 F.3d 1025, 1029–31 (9th Cir. 1998) (same).

Applying this framework to the current case, the repairs are properly considered done by the Port.  The agreement between Oregon Coast and the Port gives Oregon Coast responsibility for the specified repair and maintenance operations; yet Oregon Coast must adhere to the agreed-upon maintenance plan, which gives the Port a degree of control by specifying particular tasks and timelines that Oregon Coast must meet.  Moreover, track maintenance and repair are essential to providing transportation over a railway.  Thus by helping the Port maintain its track and re-establish its connection to the interstate rail network, the repair work performed by Oregon Coast is "an integral part of [the Port's] provision of transportation by rail carrier."  *See id*.

Finally, we note the absurd result that would occur if the Port were able to divest the Board of jurisdiction simply by hiring a contractor to perform repair or maintenance work on its behalf.  The ICCTA and its predecessor, the Interstate Commerce Act, ch. 104, 24 Stat. 379 (1887), have "been recognized as 'among the most pervasive and comprehensive of federal regulatory schemes,'" *City of Auburn v. United States*, 154 F.3d 1025, 1027 (9th Cir. 1998) (quoting *Chicago & N.W. Transp. Co. v. Kalo Brick & Tile Co.*, 450 U.S. 311, 318 (1981)).  Allowing a rail carrier to avoid federal jurisdiction by hiring a contractor would defeat Congress's purpose in creating such a far-reaching regulatory scheme.  Because "statutory interpretations which would produce absurd results are to be avoided," *Ma v. Ashcroft*, 361 F.3d 553, 558 (9th Cir. 2004) (citing *United States v. Wilson*, 503 U.S. 329, 334 (1992)), we cannot conclude that Congress intended to exclude from federal jurisdiction any party carrying out a rail carrier's essential transportation-related functions on its behalf.

Accordingly, the repair work done by Oregon Coast is properly considered "transportation by rail carrier" within the meaning of 49 U.S.C. § 10501(a)(1). The district court erred in concluding otherwise.

B

Once the other prongs of the jurisdictional inquiry are met, the ICCTA gives the Board jurisdiction over domestic rail transportation "between a place in . . . a State and a place in the same or another State as part of the interstate rail network." 49 U.S.C. § 10501(a)(2)(A). Because Oregon Coast's repair work takes place entirely within the state of Oregon, it satisfies this prong if it is done "as part of the interstate rail network." *Id.* We conclude that it is.

The phrase "as part of the interstate rail network" is not defined by statute, but the Board has interpreted it "broadly to include (but not be limited to) facilities that are part of the general system of rail transportation and are related to the movement of passengers or freight[]in interstate commerce." *DesertXpress Enters., LLC*, No. 34914, 2010 WL 1822102, at *9 (S.T.B. May 7, 2010). The Board has also emphasized that the ICCTA actually expanded the Board's jurisdiction to ensure that "transportation between places in the same state would be within the Board's jurisdiction as long as that transportation was related to interstate commerce." *Id.* at *6.

We confirmed this interpretation in *City of Auburn*, where we held that the Board had exclusive jurisdiction over an intrastate railroad repair project that aimed to prepare a section of track — at the time used only for local traffic — to join a reestablished main line for through traffic. 154 F.3d at 1031. In that case, we "not[ed] that Congress and the courts

long have recognized a need to regulate railroad operations at the federal level." *Id.* at 1029. We also highlighted the fact that § 10501 itself expressly refers to the Board's jurisdiction over "the construction . . . of spur, industrial, team, switching, or side tracks, or facilities, *even if the tracks are located, or intended to be located, entirely in one State*." *Id.* at 1030 (emphasis added) (quoting 49 U.S.C. § 10501(b)(2)).[3]

The facts of the current case closely mirror *City of Auburn*. Oregon Coast contracted with the Port to perform repair work on a section of track that was previously connected to the interstate rail network and that would, once fully repaired, reconnect the track to the interstate rail network. The agreement between Oregon Coast and the Port expressly contemplates that the track may be reconnected to the interstate network within the five-year span of the agreement, allowing the parties to negotiate a modification to the agreement — but leaving the agreement in place — if the "rail connection to a mainline carrier providing service [is] re-established and freight traffic resume[s]." Similarly, the lease agreement gives Oregon Coast the "option . . . to reinstall the rail line and recover" eighteen train cars that are currently stranded on the severed portion of track. These provisions suggest that Oregon Coast's repair work is aimed at reconnecting the disconnected track to the interstate rail

---

[3] Although this language appears in the preemption provision, 49 U.S.C. § 10501(b), rather than in the jurisdictional grant, 49 U.S.C. § 10501(a), it nevertheless informs our interpretation of the jurisdictional provision, because the general jurisdictional grant of § 10501(a) must be at least as broad as the *exclusive* jurisdiction provision of § 10501(b). *See Medtronic, Inc. v. Lohr*, 518 U.S. 470, 485–86 (1996) (explaining that a court may properly look to the statutory framework and surrounding provisions for guidance in interpreting the scope of preemption).

network.  Thus, as in *Auburn*, this repair work is done "as part of the interstate rail network."

Moreover, even if Oregon Coast's work did not result in full reconnection of the track, the repairs would still be considered "part of the interstate rail network" because they involve track that is still federally authorized as part of the interstate rail system.  In a similar case that is instructive here, the Board concluded that it had jurisdiction over a project to rehabilitate a depot serving a rail line that had not been in service for years but was still federally authorized. *City of Creede*, No. 34376, 2005 WL 1024483, at *8 (S.T.B. May 3, 2005).  Here, similarly, the repair work is being done on track that is owned by the Port and is still federally authorized under the Port's Certificate of Public Convenience and Necessity, despite the physical disconnection caused by storm damage.  The fact these repairs are integral to the functioning of a federally authorized track segment establishes that the repairs are done "as part of the interstate rail network" within the meaning of § 10501(a)(2)(A).

Although the State cites several cases purportedly demonstrating that the Board does not have jurisdiction over wholly intrastate segments of track, those cases do not affect our analysis.  We note that *Magner-O'Hara Scenic Railway v. Interstate Commerce Commission*, a Sixth Circuit case considering a similar question, was decided before the ICCTA expanded Board jurisdiction over intrastate transportation.  692 F.2d 441, 442–43 (6th Cir. 1982).  And we are unpersuaded by the logic of more recent cases citing *Magner* without acknowledging the significant expansion of jurisdiction under the ICCTA.  *See RLTD Ry. Corp. v. Surface Transp. Bd.*, 166 F.3d 808, 813 (6th Cir. 1999); *Fun*

*Trains, Inc.*, No. 33472, 1998 WL 92052, at \*2 (S.T.B. Mar. 5, 1998).

We conclude, therefore, that the repair work performed by Oregon Coast under the agreement with the Port is properly considered done "as part of the interstate rail network." 49 U.S.C. § 10501(a)(2)(A).  Because the repair work also qualifies as "transportation by rail carrier," as discussed above, we conclude that it falls within the Board's jurisdiction under 49 U.S.C. § 10501(a).

## III

Once jurisdiction is established under 49 U.S.C. § 10501(a), the broad preemption provision of 49 U.S.C. § 10501(b) makes the Board's jurisdiction exclusive over "(1) transportation by rail carriers" and "(2) the construction, acquisition, operation, abandonment, or discontinuance of spur, industrial, team, switching, or side tracks, or facilities, even if the tracks are located, or intended to be located, entirely in one State."   This subsection also expressly provides that "the remedies provided under this part with respect to regulation of rail transportation are exclusive and preempt the remedies provided under Federal or State law." 49 U.S.C. § 10501(b).  Because the repair work here falls squarely within this preemption provision, we conclude that state regulation is preempted.

Our decision on this question is controlled by *City of Auburn*, in which we  held that 49 U.S.C. § 10501(b) preempted not just economic but also environmental regulation, "[f]or if local authorities have the ability to impose 'environmental' permitting regulations on the railroad, such power will in fact amount to 'economic

regulation' if the carrier is prevented from constructing, acquiring, operating, abandoning, or discontinuing a line." 154 F.3d at 1031.  Looking to the language of 49 U.S.C. § 10501(b), we emphasized in *City of Auburn* that "[i]t is difficult to imagine a broader statement of Congress's intent to preempt state regulatory authority over railroad operations."  *Id.* at 1030 (quoting *CSX Transp., Inc. v. Ga. Pub. Serv. Comm'n*, 944 F. Supp. 1573, 1581 (N.D. Ga. 1996)).  As a result, we held that 49 U.S.C. § 10501(b) "explicitly grant[ed] the [Board] exclusive authority over railway projects like" the intrastate rail repair project at issue in *City of Auburn*, which closely resembles the project in this case.  *City of Auburn*, 154 F.3d at 1030.

Our subsequent decision in *Association of American Railroads v. South Coast Air Quality Management District* clarified that the ICCTA "does not preempt state or local laws if they are laws of general applicability that do not unreasonably interfere with interstate commerce," but it "preempts all 'state laws that may reasonably be said to have the effect of managing or governing rail transportation.'" 622 F.3d 1094, 1097 (9th Cir. 2010) (first citing *Bos. & Me. Corp. & Town of Ayer*, No. 33971, 2001 WL 458685, at \*4–6 (S.T.B. May 1, 2001); then quoting *N.Y. Susquehanna & W. Ry. Corp. v. Jackson*, 500 F.3d 238, 252 (3d Cir. 2007)).  In determining whether a law of general applicability is permissible, we explained that "[w]hat matters is the degree to which the challenged regulation burdens rail transportation."  *Id.* at 1097–98 (quoting *N.Y. Susquehanna*, 500 F.3d at 252).

Here, the State's removal-fill law requires that Oregon Coast apply for and be granted a permit before removing "any amount of material within waters designated Essential

Salmonid Habitat."    Because "the ability to impose 'environmental' permitting regulations on the railroad" can in fact give local authorities the power to "prevent[ a carrier] from constructing, acquiring, operating, abandoning, or discontinuing a line," *City of Auburn*, 154 F.3d at 1031, such a permitting scheme would "have the effect of managing or governing rail transportation," *Ass'n of Am. R.R.s*, 622 F.3d at 1097 (quoting *N.Y. Susquehanna*, 500 F.3d at 252).  Thus even under the more subjective approach used in *Association of American Railroads*, we conclude that the State's removal-fill law is preempted by the ICCTA as applied to the repair work in this case.

IV

In sum, the repair work done by Oregon Coast under its agreement with the Port falls under the Board's jurisdiction because the work is done under the auspices of a federally regulated rail carrier and is sufficiently related to the provision of transportation over the interstate rail network. The State's removal-fill law is preempted as applied to this work, and the district court erred in concluding otherwise. Because the district court's rulings on the preliminary injunction, permanent injunction, and declaratory relief were all premised on this incorrect legal determination, we reverse and remand for further proceedings with respect to each form of relief.

**REVERSED and REMANDED.**