**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

| | |
|---|---|
| JACKSON WELLS, as Personal Representative for the Estate of Thomas E. Wells, deceased; JUDITH HEMPHILL, as Personal Representative for the Estate of Joyce H. Walder, deceased, | No. 24-4802 <br><br> D.C. No. 4:21-cv-00097-BMM |
| Plaintiffs - Appellees, | |
| v. | OPINION |
| BNSF RAILWAY COMPANY, a Delaware corporation, | |
| Defendant - Appellant. | |

Appeal from the United States District Court
for the District of Montana
Brian M. Morris, Chief District Judge, Presiding

Argued and Submitted October 21, 2025
Portland, Oregon

Filed February 24, 2026

Before: Consuelo M. Callahan, Morgan B. Christen, and
Andrew D. Hurwitz, Circuit Judges.

Opinion by Judge Christen;
Concurrence by Judge Callahan

## SUMMARY[*]

### Common Carrier Exception / Montana Law

The panel reversed the district court's judgment in favor of Plaintiffs, former residents of Libby, Montana who developed mesothelioma from asbestos exposure, on their strict liability claims against BNSF Railway Company arising from BNSF's transportation of asbestos-containing vermiculite.

BNSF was required by federal law to transport asbestos-containing vermiculite from the world's largest vermiculite mine to its railyard in Libby, Montana, and from there to destinations nationwide.

Recently, in another case against BNSF for personal injuries caused by asbestos exposure in Libby, the Montana Supreme Court adopted § 521 of the Restatement (Second) of Torts, which provides for an exception to strict liability for abnormally dangerous activities. *BNSF Ry. Co. v. Eddy*, 459 P.3d 857 (Mont. 2020). The common carrier exception bars the imposition of strict liability for an abnormally dangerous activity if the activity is undertaken pursuant to a public duty imposed upon the actor as a common carrier.

---

[*] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

The panel held that the district court erred by interpreting the common carrier exception too narrowly when it held that BNSF was ineligible for the common carrier exception on the grounds that it did not act pursuant to a public duty when it failed to maintain its railyard and tracks where asbestos collected. The dangerous condition here—accumulated asbestos dust—arose solely from BNSF's operation as a common carrier executing its federally mandated duty to transport vermiculite. Montana caselaw strongly supported the conclusion that BNSF was entitled to the protection afforded by the common carrier exception. Accordingly, the panel held that BNSF was protected from strict liability by the common carrier exception.

The panel concluded that certification to the Montana Supreme Court on the question of whether the common carrier exception applied to BNSF's actions was unwarranted because there was sufficient Montana state law to answer the question.

The panel reversed the district court's judgment and remanded with instructions to enter judgment for BNSF.

Concurring, Judge Callahan joined the opinion in full because it correctly concluded that under Montana law the common carrier exception protects BNSF from plaintiffs' strict liability claims. She wrote separately to stress that the Interstate Commerce Commission Termination Act separately preempts plaintiffs' strict liability claims.

**COUNSEL**

Kevin P. Parker (argued), C. Alfred Mackenzie, Megan M. Waida, and W. Mark Lanier, The Lanier Law Firm PC, Houston, Texas; Jinnifer J. Mariman and John F. Lacey, McGarvey Law, Kalispell, Montana; for Plaintiffs-Appellees.

Dale Schowengerdt (argued) and Timothy Longfield, Landmark Law PLLC, Helena, Montana; Chad Knight, Knight MacKay Morrow LLC, Kansas City, Missouri; for Defendant-Appellant.

**OPINION**

CHRISTEN, Circuit Judge:

From 1922 to 1990, BNSF Railway Company was required by federal law to transport asbestos-containing vermiculite from the world's largest vermiculite mine to its railyard in Libby, Montana, and from there to destinations nationwide. Thomas Wells and Joyce Walder were former residents of Libby who developed mesothelioma from asbestos exposure. Their estates asserted negligence and strict liability claims against BNSF arising from its transportation of vermiculite and sought compensatory and punitive damages. After a ten-day trial, the jury returned a verdict for Plaintiffs on their strict liability claims but in favor of BNSF on Plaintiffs' negligence claims. The jury did not award punitive damages.

On appeal, BNSF argues that the common carrier exception shields it from strict liability. Plaintiffs counter

that BNSF was not acting as a common carrier when it allowed vermiculite that contained asbestos to accumulate in its railyard. In the alternative, Plaintiffs ask us to certify to the Montana Supreme Court the question whether the common carrier exception applies to BNSF's actions.

We conclude that BNSF is protected from strict liability by the common carrier exception. Plaintiffs' claims arose from activities BNSF engaged in while pursuing its statutorily imposed duty as a common carrier. Separately, we conclude that certification is unwarranted. We therefore reverse the district court's judgment and remand with instructions to enter judgment for BNSF.

I.

A.

Between 1922 and 1990, the world's largest source of vermiculite was a mine located approximately seven miles outside of Libby, Montana. Vermiculite is a mineral that was commonly used during that period for fireproof roofing, insulation, and wallpaper.

For the most part, two companies were involved in the extraction, processing, and shipment of vermiculite from Libby: W.R. Grace & Company and BNSF. W.R. Grace extracted vermiculite from a mine outside of Libby from 1963 to 1990, and processed raw vermiculite ore to remove impurities. This created vermiculite concentrate and leftover waste, or tailings.

It is now known that the concentrate contained asbestos fibers. Processing the vermiculite ore into concentrate decreased the amount of asbestos in the material, but the exact extent of this reduction was contested at trial. By one measure, the raw vermiculite ore contained up to twenty-six

percent asbestos, and evidence showed that the tailings could contain up to eighty percent.

BNSF was required by federal law to transport W.R. Grace's vermiculite concentrate upon request. 49 U.S.C. § 11101(a). W.R. Grace filled empty railcars with concentrate at the mine site and sealed them before BNSF hauled the cars to its Libby railyard. The railyard spanned approximately twenty acres in the northern downtown area. From the railyard, BNSF shipped the railcars nationwide.

Initially, W.R. Grace certified on bills of lading prepared for each railcar that the vermiculite concentrate shipments were not hazardous. The Montana Department of Environmental Quality reported as late as 1974 that asbestos was removed by processing vermiculite ore into concentrate. However, evidence at trial showed that by 1977, W.R. Grace posted placards on at least some railcars stating that the vermiculite concentrate inside contained asbestos. It was not until decades later, in 2000, that the Environmental Protection Agency (EPA) began an extensive cleanup in Libby pursuant to the Comprehensive Environmental Response, Compensation and Liability Act, 42 U.S.C. § 9601 (CERCLA). *United States v. W.R. Grace & Co.*, 429 F.3d 1224, 1232 (9th Cir. 2005) (summarizing the EPA's response to the "truly extraordinary" situation in Libby as "no mere run-of-the-mill CERCLA cleanup," but rather, "a unique removal action of a size and cost not previously seen").

At trial, the evidence showed that asbestos-containing vermiculite escaped from railcars during the regular course of transportation and also during railcar switching operations in the railyard. The evidence further demonstrated that vermiculite pervaded downtown Libby. W.R. Grace stored

vermiculite in an export plant in the downtown area and donated tailings to spread over a local baseball field to absorb rainwater. Unaware of the danger, many Libby residents used vermiculite in a variety of ways in their homes and on their lawns.

Thomas Wells worked for the Forest Service in Lincoln County, Montana from June through September and most of November in 1978 and also from July to August in 1981. Between June to November in 1978, he lived in a trailer home abutting BNSF's railyard. Joyce Walder lived in Libby from 1954 to 1972 and from 1976 to 1978, then visited periodically through 2009. During her childhood, Walder frequented the baseball and football fields and the running track near the railyard. She also walked across the railyard and swam in the city pool, which was located near the railyard.

The jury found that Plaintiffs had been exposed to asbestos. Both Wells and Walder were diagnosed with mesothelioma, a cancer caused by exposure to asbestos that affects tissues surrounding the lungs. *See Norfolk & W. Ry. Co. v. Ayers*, 538 U.S. 135, 142 & n.4 (2003). Tragically, each died within months after receiving this diagnosis.

## B.

In 2021, the personal representatives of Plaintiffs' estates filed this action against BNSF in the United States District Court for the District of Montana, asserting negligence and strict liability claims.

Two divergent narratives of BNSF's activities in Libby emerged. Before trial, BNSF sought summary judgment on Plaintiffs' strict liability claims, arguing that it had acted pursuant to its statutorily imposed duty as a common carrier

when it transported vermiculite concentrate. Plaintiffs argued that BNSF had not acted as a common carrier when it stored "'reservoirs' of asbestos and asbestos contaminated materials at [its] Libby railyard." The district court denied BNSF's motion, reasoning that if Plaintiffs could establish their allegations at trial, "harbor[ing] a toxic asbestos dump in the Libby railyard" would be "removed from BNSF's role as a [common] carrier of vermiculite."

A ten-day jury trial commenced in Helena in April 2024. In contrast to their opposition to BNSF's motion for summary judgment, Plaintiffs' opening statement made no mention of BNSF storing vermiculite or reservoirs of asbestos on its property. After opening statements, the district court expressed "serious questions about the viability of [Plaintiffs'] strict liability claim," because its initial understanding that "the material was . . . stored at the railyard, and then loaded on railcars" now "seem[ed] to be erroneous." As trial progressed, testimony showed that BNSF did not store vermiculite ore or concentrate at its Libby railyard, but asbestos dust had nonetheless accumulated on BNSF's property. At the close of Plaintiffs' case, the district court questioned whether Plaintiffs' theory of BNSF's liability was actually premised on BNSF's "inactivity" for failing to properly maintain the railyard. BNSF moved for judgment as a matter of law on Plaintiffs' strict liability claims, again invoking the common carrier exception. The court denied the motion, explaining its view that "[n]othing under BNSF's duty as a common carrier prevented [BNSF] from periodically cleaning the railyard, or from improving its facilities to capture vermiculite dust for safe disposal." During closing argument, Plaintiffs' counsel characterized BNSF's conduct underlying their lawsuit as "the condition of [BNSF's] yard."

The jury rejected Plaintiffs' negligence claims and request for punitive damages, but it found in Plaintiffs' favor on their strict liability claims and awarded $4,000,000 in compensatory damages to each estate.  The district court denied BNSF's renewed motion for judgment as a matter of law on Plaintiffs' strict liability claims, and BNSF timely appealed.

This lawsuit is one of many concerning asbestos exposure in Libby.  Initially, many individuals who claimed to have been exposed to asbestos in the Libby area sued W.R. Grace, but in 2001, W.R. Grace declared bankruptcy and placed $2.9 billion in an irrevocable trust to settle all present and future claims.  According to BNSF, after W.R. Grace declared bankruptcy, hundreds of lawsuits were filed against BNSF.  *See, e.g.*, *BNSF Ry. Co. v. Eddy*, 459 P.3d 857 (Mont. 2020); *Gallegos v. BNSF Ry. Co.*, No. 22-68, 2023 WL 8187923 (D. Mont. Nov. 27, 2023).  This is the first such lawsuit to go to trial.[1]

## II.

The district court had jurisdiction to hear Plaintiffs' claims in this diversity action pursuant to 28 U.S.C. § 1332. We have appellate jurisdiction pursuant to 28 U.S.C. § 1291 and review de novo the district court's interpretation of state law.  *Casun Inv., A.G. v. Ponder*, 119 F.4th 637, 642 (9th Cir. 2024), *cert. denied sub nom. NVWS Props., LLC v. Casun Inv., A.G.*, 145 S. Ct. 1927 (2025).

---

[1] Another has been stayed pending the resolution of this appeal.  *See Moe v. BNSF Ry. Co.*, No. 9:22-cv-00068-DLC, Stay Order, ECF # 141 (D. Mont. May 1, 2024).

## III.

## A.

Decades ago, Montana adopted §§ 519 and 520 of the Restatement (Second) of Torts, which outline strict liability for abnormally dangerous activities. *See Matkovic v. Shell Oil Co.*, 707 P.2d 2, 4 (Mont. 1985). Section 519 provides:

> (1) One who carries on an abnormally dangerous activity is subject to liability for harm to the person, land or chattels of another resulting from the activity, although he has exercised the utmost care to prevent the harm. (2) This strict liability is limited to the kind of harm, the possibility of which makes the activity abnormally dangerous.

Restatement (Second) of Torts § 519 (A.L.I. 1977). Section 520 provides six factors to consider when determining whether an activity is abnormally dangerous:

> (a) existence of a high degree of risk of some harm to the person, land or chattels of others;
> (b) likelihood that the harm that results from it will be great;
> (c) inability to eliminate the risk by the exercise of reasonable care;
> (d) extent to which the activity is not a matter of common usage;
> (e) inappropriateness of the activity to the place where it is carried on; and

(f) extent to which its value to the community
    is outweighed by its dangerous attributes.

Though a court must consider all factors, all factors "need not be present" for an activity to qualify as abnormally dangerous. *Covey v. Brishka*, 445 P.3d 785, 792 (Mont. 2019).

Recently, in another case against BNSF for personal injuries caused by exposure to asbestos in Libby, the Montana Supreme Court also adopted § 521 of the Second Restatement, which provides for an exception to strict liability for common carriers. *See Eddy*, 459 P.3d at 873–74. The common carrier exception bars the imposition of "strict liability for abnormally dangerous activities . . . if the activity is carried on in pursuance of a public duty imposed upon the actor . . . as a common carrier." Restatement (Second) of Torts § 521 (A.L.I. 1977). This exception addresses concerns that "it would be unjust to subject a common carrier to strict liability for any danger done by a material the carrier is required to transport by law." *Eddy*, 459 P.3d at 873. Accordingly, Montana law applies the exception to abnormally dangerous activities "carried on in pursuance of a public duty" when "that public duty is imposed on the actor as a common carrier." *Id.* at 874.

## B.

We begin from the premise that BNSF's transportation of vermiculite concentrate was an abnormally dangerous activity. The district court ruled that BNSF was precluded from arguing otherwise by the Montana Supreme Court's decision in *Eddy*, 459 P.3d at 868–73, and BNSF does not challenge that ruling on appeal. Rather, BNSF argues only that the common carrier exception exempts it from strict

liability.  BNSF contends that the district court construed the common carrier exception too narrowly, interpreting it to apply only to "public-duty-imposed common carrier activities."  More specifically, BNSF argues that the district court erred by ruling that it was ineligible for the common carrier exception on the grounds that BNSF did not act pursuant to a public duty when it failed to maintain its railyard and tracks where asbestos collected.

We agree that the district court interpreted the scope of the common carrier exception too narrowly.[2]  As adopted by Montana and the vast majority of states, the exception shields common carriers from strict liability for harm caused

---

[2] The concurrence addresses preemption of the strict liability claims by the Interstate Commerce Commission Termination Act of 1995 (ICCTA), Pub. L. 104-88, 109 Stat. 803, an issue we do not reach because we can resolve this appeal on the common carrier exception and the scope of ICCTA's potential preemption was not adequately briefed. As the concurrence notes, the parties did not address whether the ICCTA would preempt other state law claims, such as negligence, because the jury did not find BNSF negligent and Plaintiffs did not appeal that adverse finding.  At oral argument before our court, BNSF equivocated on the scope of the ICCTA's proposed preemption; specifically, whether it might apply to negligence.  The common carrier exception provides a simpler ground for resolution of this appeal and does not implicate the same federalism concerns that attend preemption of state laws of general applicability.  *See Wyeth v. Levine,* 555 U.S. 555, 565 (2009); *Bates v. Dow Agrosciences LLC,* 544 U.S. 431, 449 (2005); *see also Moore v. Trader Joe's Co.*, 4 F.4th 874, 880 (9th Cir. 2021) (affirming dismissal of state law claims on the basis that the complaint failed to state a claim and declining to reach federal preemption).  By declining to reach preemption, we adhere to the principle of judicial restraint that "if it is not necessary to decide more, it is necessary not to decide more." *Morse v. Frederick*, 551 U.S. 393, 431 (2007) (Breyer, J., concurring in the judgment in part and dissenting in part) (quoting *PDK Labs., Inc. v. Drug Enforcement Admin.*, 362 F.3d 786, 799 (D.C. Cir. 2004) (Roberts, J., concurring in part and concurring in judgment)).

during transport "because common carriers must accept, carry, and deliver all goods offered to them for transport within the scope of the operating authority set forth in their permits." *In re Hanford Nuclear Rsrv. Litig.*, 534 F.3d 986, 1006 (9th Cir. 2008).[3]  Unlike private shippers, common carriers "cannot discriminate against customers or refuse to accept commodities that may be dangerous for transport." *Id.  Eddy* explained that a common carrier is not strictly liable for dangers inherent in "a material the carrier is required to transport by law."  459 P.3d at 873.  *Eddy* also held that as a rail carrier, BNSF qualifies as a common carrier for the purposes of the common carrier exception.  *Id.* at 874.

The parties do not dispute that the "asbestos-contaminated vermiculite entered the Libby railyard via BNSF's transport."  The jury heard testimony that vermiculite dust fell "along the tracks and within the railyard" after it escaped from railcars during car switching operations and during transport along the railroad.  Federal law defines "transportation" broadly to include "delivery," "storage," "handling," and "services related to [the] movement" of property.  49 U.S.C. § 10102(9).  Plaintiffs' theory of liability thus stems directly from BNSF's statutory

---

[3] *Eddy* recognized that this exception has been broadly adopted.  459 P.3d at 873; *see, e.g.*, *Pecan Shoppe of Springfield, Inc. v. Tri-State Motor Transit Co.*, 573 S.W.2d 431, 435 (Mo. Ct. App. 1978)*; Town of East Troy v. Soo L. R.R. Co.*, 409 F. Supp. 326, 330 (E.D. Wis. 1976); *Christ Church Parish v. Cadet Chem. Corp.*, 199 A.2d 707, 708 (Conn. Super. Ct. 1964); *Albig v. Mun. Auth. of Westmoreland Cnty.*, 502 A.2d 658, 663 (Pa. Super. Ct. 1985); *Ruiz v. S. Pac. Transp. Co.*, 638 P.2d 406, 412 (N.M. Ct. App. 1981); *Peneschi v. Nat'l Steel Corp.*, 295 S.E.2d 1, 5 (W. Va. 1982); *Cairl v. St. Paul*, 268 N.W.2d 908, 911 (Minn. 1978); *Voelker v. Delmarva Power & Light Co.*, 727 F. Supp. 991, 994 (D. Md. 1989).

duty to transport vermiculite concentrate.  *See id.* at
§ 11101(a).

Plaintiffs attempt to distinguish the condition of BNSF's
railyard from BNSF's role as a common carrier, because
escaped asbestos that accumulated in BNSF's railyard was
no longer in transit.  Plaintiffs argue that the escaped
asbestos constituted an abnormally dangerous condition on
the land for which BNSF should be strictly liable as a
property owner.  In support, Plaintiffs cite *Covey*, a case in
which the Montana Supreme Court concluded that
maintaining a man-made fishpond on a mountainside was an
abnormally dangerous condition that triggered strict
liability.  445 P.3d at 790–91.  This analogy is inapt.  *Covey*
involved the voluntary maintenance of a man-made 4.5-
million-gallon fishpond for private purposes, upslope from
other property owners.  *Id.* at 789.  The *Covey* defendant was
held strictly liable after his "pond breached its banks
and . . . [t]he water carried boulders, trees, and other debris
downhill[,] . . . carv[ing] large channels into the hillside."
*Id.*  In contrast, the dangerous condition here—accumulated
asbestos dust—arose solely from BNSF's operation as a
common carrier executing its federally mandated duty to
transport vermiculite.  *Cf. Anderson v. BNSF*, No. ADV-
2008-101, 2010 Mont. Dist. LEXIS 73, at \*4 (Mont. Dist.
Feb. 2, 2010) (concluding that the common carrier exception
immunized BNSF from strict liability for diesel fuel stored
at BNSF's railyard that leaked to surrounding property
because storing fuel "is an integral part of its operation as a
common carrier").

The result we reach today is consistent with *Town of East
Troy v. Soo Line Railroad Company*, 409 F. Supp. 326, 328
(E.D. Wis. 1976), which the *Eddy* court cited with approval.
*See Eddy*, 459 P.3d at 873.  *Town of East Troy* involved a

train that derailed while transporting hazardous acid. 409 F. Supp. at 328. The railroad company waited nine days before attempting to remove acid-contaminated soil from the derailment site, and that delay allowed the spill to foul the surrounding community's groundwater supply. *Id.* at 330. The plaintiff in *Town of East Troy* alleged that the railroad company "knew or should have known" that it was engaged in an abnormally dangerous activity by transporting hazardous acid. *Id.* But the district court dismissed the claim because it concluded that the common carrier exception shielded the company from strict liability. *Id.; see also Walsh v. Mont. Rail Link*, 2001 ML 1418, 2001 Mont. Dist. LEXIS 3033, at *21–22 (Mont. Dist. May 8, 2001) (holding that the common carrier exception immunized a rail company from strict liability for injuries resulting from toxic chemicals spilled when a train derailed); *Griffin v. Mont. Rail Link*, 2000 ML 2438, 2000 Mont. Dist. LEXIS 1331, *2 (Mont. Dist. Aug. 29, 2000) (same).

This caselaw strongly supports the conclusion that BNSF is entitled to the protection afforded by the common carrier exception because it is uncontested that the asbestos dust that accumulated in BNSF's railyard leaked or escaped from rail cars during BNSF's required transportation of vermiculite concentrate. The fact that the dust accumulated gradually along the railroad tracks and in BNSF's railyard, rather than spilling abruptly, does not alter our analysis because the gradual spillage still occurred during BNSF's shipment of vermiculite.

In reaching the opposite conclusion, the district court emphasized that Montana does not apply the common carrier exception when a common carrier engages in "abnormally dangerous activit[ies] for 'its own purposes'" rather than in "pursuance of a public duty," *Eddy*, 459 P.3d at 875 (quoting

*Murphy-Fauth v. BNSF Ry. Co.*, No. 17-79, 2018 WL 3601235, at *2 (D. Mont. July 27, 2018)).[4]   The court reasoned that no public duty obligated BNSF to "maintain[] uncontained asbestos-containing material open air on its property," and that BNSF allowed accumulated dust to remain in the railyard for its own gain because foregoing maintenance of the yard increased revenue and prevented transportation delays.  The district court analogized this case to *In re East Palestine Train Derailment*, a case decided by the United States District Court for the Northern District of Ohio in which a railroad company "transport[ed] over a million pounds of hazardous chemicals and," after a derailment, "intentionally set[] fire to them in a residential neighborhood."      No.  4:23-cv-0242-BYP,  2024  WL 1096064, at *10 (N.D. Ohio Mar. 13, 2024).  Crucial to the *East Palestine* court's conclusion that the common carrier exception did not apply was the fact that, in responding to the spill, the railroad company "voluntarily undertook activities for [its] own purpose; namely to release and burn vinyl chloride in order to get the derailed cars out of the way to start . . .  trains running through East Palestine again to earn revenue."  *Id.* at *11.  Unlike the situation in *East Palestine*, here the district court cited no evidence, and on appeal Plaintiffs point to no evidence, that BNSF aimed to save money by not cleaning its railyard.  Indeed, for decades,

---

[4] The plaintiff in *Murphy-Fauth* alleged injury from asbestos exposure as a result of BNSF's activities in Libby.  *See Murphy-Fauth*, 2018 WL 3601235, at *1–2.  The plaintiff's allegations extended beyond just the transport of vermiculite and included allegations that "BNSF played a central role in the vermiculite operations in Libby" by collaborating with W.R. Grace to "develop[] new uses for vermiculite products and assist[] in marketing."  *See* D. Mont. No. 17-cv-00079-BMM-JTJ, Dkt. No. 63 ¶ 23.  The district court denied BNSF's motion to dismiss, but the parties settled shortly thereafter.  *Id.* at *4.

even the Montana Department of Environmental Quality advised that vermiculite concentrate did not contain asbestos.

The district court adopted Plaintiffs' characterization of BNSF's "abnormally dangerous activity" as "maintain[ing] asbestos on its property." Plaintiffs framed BNSF's conduct as an affirmative act ("maintaining"), but their theory of strict liability was actually premised on BNSF's alleged "fail[ure] to take measures to prevent toxic dust from collecting upon and escaping from its property." That theory, which assumes that the risk of harm would have been eliminated if BNSF had "adequately clean[ed]" its railyard, effectively treats Plaintiffs' strict liability claims as negligence claims. To be sure, the Montana Supreme Court has explained that the common carrier exception would not have shielded BNSF from a negligence claim, *Eddy*, 459 P.3d at 874, but the jury expressly rejected Plaintiffs' negligence theory and found that BNSF "exercise[d] reasonable care in its handling of asbestos."

## C.

Plaintiffs chose to file this action in federal court, but on appeal they urge us to certify to the Montana Supreme Court the question whether Montana's common carrier exception for strict liability encompasses BNSF's failure to maintain its railyard.[5] We decline to do so.

---

[5] Specifically, Plaintiffs ask this panel to certify the following question:

> Does Montana's common carrier exception to strict liability for an abnormally dangerous activity or condition immunize BNSF from strict liability for harm caused by asbestos in or on its Libby railyard, when the prolonged presence of this toxic substance in

A federal court sitting in diversity is empowered "to decide questions of state law." *Abraham v. Corizon Health, Inc.*, 985 F.3d 1198, 1202 (9th Cir. 2021). "However, if state law permits it, we may exercise our discretion to certify a question to the state's highest court." *Murray v. BEJ Minerals, LLC*, 924 F.3d 1070, 1071 (9th Cir. 2019) (en banc). The Montana Supreme Court permits certification of questions of law from federal courts when "[t]he answer may be determinative of an issue in pending litigation in the certifying court" and "[t]here is no controlling appellate decision, constitutional provision, or statute of this State." Mont. R. App. P. 15(3).

In deciding whether to certify a question, we consider "(1) whether the question presents 'important public policy ramifications' yet unresolved by the state court; (2) whether the issue is new, substantial, and of broad application; (3) the state court's caseload; and (4) 'the spirit of comity and federalism.'" *Murray*, 924 F.3d at 1072 (quoting *Kremen v. Cohen*, 325 F.3d 1035, 1037 (9th Cir. 2003)). Because certification burdens state courts and the parties and can prolong litigation, we do not invoke it lightly. *Id.* Moreover, we have explained that "[w]hen there is little reason to doubt the answer to a state-law question, we ought not outsource our work to a state court." *Bliss Sequoia Ins. & Risk Advisors, Inc. v. Allied Prop. & Cas. Ins. Co.*, 52 F.4th 417, 423 (9th Cir. 2022).

In *Eddy*, the Montana Supreme Court applied the common carrier exception to "the manner in which [BNSF] conducted the transport of vermiculite," reasoning that "BNSF is entitled to the common carrier exception for strict

and on its Libby railyard was not required by BNSF's statutory duties as a common carrier?

liability imposed as a result of its transporting of vermiculite, which it was required to do by law." *Id.* at 874. *Eddy* remanded to the trial court to determine whether BNSF's *other* activities fell within the scope of the exception. *Id.* at 875. The complaint in *Eddy* alleged that BNSF's other actions included "industrial activities" such as disturbance of asbestos and collaboration with W.R. Grace to "strategize regarding distribution of the product and geologic sampling," as well as other undertakings "not required of a common carrier." *Eddy*, 459 P.3d at 864 & n.1, 873. *Eddy* leaves little doubt that the outcome of this case is controlled by the common carrier exception because Plaintiffs complain about the deposit of asbestos-containing vermiculite along the tracks and in the Libby railyard, and the asbestos-containing vermiculite fell on the tracks and entered the railyard during the course of BNSF's transportation of vermiculite concentrate. In other words, Plaintiffs attempt to hold BNSF strictly liable "for the manner in which it conducted the transport of vermiculite," which the Montana Supreme Court specifically foreclosed in *Eddy*. *Id.* at 874.

We therefore conclude that certification is unwarranted because there is sufficient Montana state law to answer the question presented. *See Syngenta Seeds, Inc. v. Cnty. of Kauai*, 842 F.3d 669, 681 (9th Cir. 2016). These claims have been pending since 2021 and involve alleged exposure to asbestos dating back to 1954. *See Riordan v. State Farm Mut. Auto. Ins. Co.*, 589 F.3d 999, 1009 (9th Cir. 2009) ("[W]e do not find it necessary to further prolong these proceedings [by certifying questions to the Montana Supreme Court] where the state law is clear.").

**REVERSED and REMANDED with instructions.**

CALLAHAN, J., concurring:

I join the opinion in full because it correctly concludes that under Montana law the common carrier exception protects BNSF from Plaintiffs' strict liability claims. I write separately to stress that, in my view, the Interstate Commerce Commission Termination Act separately preempts Plaintiffs' strict liability claims.

## I

## A

To substantially reform excessive economic regulation of the Nation's transportation industries, Congress adopted the Interstate Commerce Commission Termination Act of 1995 (ICCTA). Pub. L. 104-88, 109 Stat. 803. ICCTA grants the Surface Transportation Board jurisdiction over specific modes and locations of "transportation by rail carrier." 49 U.S.C. § 10501(a). For that transportation and certain related activities, the Board has exclusive jurisdiction. *Id.* § 10501(b). ICCTA also provides a comprehensive remedial scheme for enforcing regulations of rail transportation, holding rail carriers liable, and providing remedies to persons injured by rail carriers. *Id.* §§ 11701-11707. Remedies provided by ICCTA "with respect to regulation of rail transportation are exclusive and preempt the remedies provided under Federal or State law." *Id.* § 10501(b).

We first interpreted ICCTA's preemptive scope in *City of Auburn v. United States*, observing that "[i]t is difficult to imagine a broader statement of Congress's intent to preempt state regulatory authority over railroad operations." 154 F.3d 1025, 1030 (9th Cir. 1998) (quoting *CSX Transp., Inc. v. Ga Pub. Serv. Comm'n*, 944 F. Supp. 1573 (N.D. Ga.

1996)).    There,  we  held  that  ICCTA  preempts  not  only
nominal "economic" regulations but also other regulations
that "will in fact amount to 'economic regulation.'"   *Id.* at
1031; *see also Or. Coast Scenic R.R., v. Or. Dep't of State
Lands*, 841 F.3d 1069, 1076-77 (9th Cir. 2016).   We have
also held that ICCTA preemption applies both to laws
targeting railroad operations, *City of Auburn*, 154 F.3d at
1031, and to laws of general applicability that would have
the "effect of managing or governing rail transportation,"
*Ass'n of Am. R.R.s v. S. Coast Air Quality Mgmt. Dist.*, 622
F.3d 1094, 1097 (9th Cir. 2010).

**B**

Montana,  like  many  states,  has  adopted  Sections  519,
520,  and  521  of  the  Restatement  (Second)  of  Torts.   *See*
Majority  Op.  at  10-11.    Section  519  provides  for  strict
liability for abnormally dangerous activities; Section 520
lays out a multifactor test for courts to use to determine
whether  an  activity  should  be  deemed  abnormally
dangerous; and Section 521 grants an exception to strict
liability for abnormally dangerous activities undertaken by
common carriers pursuant to a public duty.   *Id.*

In  2020,  decades  after  BNSF  stopped  transporting
vermiculite for W.R. Grace & Company, the Montana
Supreme Court applied Section 520 to hold that BNSF's past
"handling  of  asbestos  under  the  facts  presented  here
constitutes an abnormally dangerous activity for which
BNSF is strictly liable."   *BNSF Ry. Co. v. Eddy*, 459 P. 3d
857, 873 (Mont. 2020).   The Montana Supreme Court ruled
that BNSF, as a common carrier, is protected by Section 521
from "strict liability imposed as a result of its transporting
vermiculite," but further stated that BNSF could face strict
liability  for  its  asbestos-handling  "activities  *other*  than

transportation of vermiculite." *Id.* at 874-75 (emphasis added). The court further noted that "BNSF may still be found liable under a theory of ordinary negligence for the manner in which it conducted the transport of vermiculite ore." *Id.* at 874.

In 2021, Plaintiff estates sued BNSF in federal district court for personal injuries, resulting in death, caused by BNSF's handling of vermiculite. Majority Op. at 7. Plaintiffs' suit asserted state law causes of action for both negligence and strict liability. *Id.* Plaintiffs premised these claims on the central proposition that BNSF failed to prevent toxic vermiculite residuals from "collecting upon and escaping from" its Libby, Montana railyard.

In 2024, a jury found for BNSF on Plaintiffs' negligence claims but found BNSF liable on Plaintiffs' strict liability claims. *Id.* at 8-9. In obtaining their favorable jury verdict on the strict liability claims, Plaintiffs relied on a fine-grained distinction between BNSF's "transportation of vermiculite" and its "other activities" dealing with vermiculite. The district court accepted this distinction, rejecting both BNSF's common carrier exception argument and ICCTA preemption argument in BNSF's renewed motion for judgment as a matter of law. BNSF also asserted—and the district court also rejected—an argument that the Hazardous Materials Transportation Act (HMTA), 49 U.S.C. § 5101 *et seq.*, separately preempts Plaintiffs'

strict liability claims.[1]  BNSF timely appealed.[2]  Majority Op. at 9.

## II

We review de novo the district court's legal conclusion about the scope of ICCTA preemption.  *Or. Coast Scenic R.R.*, 841 F.3d at 1072 (citing *In re Korean Air Lines Co.*, 642 F.3d 685, 691 n.3 (9th Cir. 2011)).

## III

To determine whether ICCTA preempts Plaintiffs' strict liability claims, we first consider whether "the activity in question" comes "within the statutory grant of jurisdiction to the Surface Transportation Board."  *Id.*; *see* 49 U.S.C. § 10501(a).  If the Board possesses jurisdiction, then we next assess whether its jurisdiction is exclusive.  *Or. Coast Scenic R.R.*, 841 F.3d at 1073; *see* 49 U.S.C. § 10501(b).  An affirmative answer to both inquiries follows from the reasoning supporting our unanimous opinion today regarding the common carrier exception.

BNSF's handling of vermiculite falls within ICCTA's grant of jurisdiction to the Surface Transportation Board. ICCTA grants jurisdiction to the Board over particular

---

[1] HMTA is the Nation's primary law regulating the transportation of hazardous materials and seeks "to protect against the risks to life, property, and the environment that are inherent in the transportation of hazardous material in intrastate, interstate, and foreign commerce."  49 U.S.C. § 5101.

[2] Plaintiffs have not appealed the jury's adverse finding on their negligence claims.  I therefore do not reach the question of whether ICCTA would preempt Plaintiffs' attempt to recover damages from BNSF based on negligence.  I also do not address BNSF's alternative argument that HMTA preempts Plaintiffs' strict liability claims.

modes and locations of "transportation by rail carrier."  49 U.S.C. § 10501(a).   This case concerns only whether BNSF's handling of vermiculite counts as "transportation by rail carrier," as defined by 49 U.S.C. § 10501(a).   Our opinion makes clear that it does.  *See* Majority Op. at 11-17. In applying the Montana Supreme Court's precedential holding that the common carrier exception protects BNSF from "strict liability imposed as a result of its transporting vermiculite," *Eddy*, 459 P. 3d at 874, we utilized ICCTA's definition of "transportation."  Majority Op. at 13 (citing 49 U.S.C. § 10102(9)).   Using ICCTA's definition, we determined that BNSF's handling of vermiculite qualifies as "transportation," and thus the common carrier exception protects BNSF from Plaintiffs' strict liability claims.  *Id.* That conclusion also answers the first question of the ICCTA preemption analysis.

Further, the Board's jurisdiction over BNSF's transportation of vermiculite is exclusive.   49 U.S.C. § 10501(b) makes the Board's jurisdiction exclusive over "transportation by rail carriers."  That Section also expressly states that "the remedies provided under this part with respect to regulation of rail transportation are exclusive and preempt remedies provided under Federal or State law." *Id.* Thus, because our opinion makes clear that BNSF's handling of vermiculite falls within ICCTA's definition of "transportation," the Board has exclusive jurisdiction and Section 10501(b) facially preempts Plaintiffs' attempt to recover on a Montana strict liability cause of action. *See* Majority Op. at 11-17.

But the preemption analysis does not end there. Montana's strict liability law is a common law tort claim of general applicability, and we have held that "ICCTA does not preempt state or local laws if they are laws of general

applicability that do not unreasonably interfere with interstate commerce." *Ass'n of Am. R.R.s*, 622 F.3d at 1097. So this case requires determining whether the application of Montana's strict liability law to BNSF's transportation of vermiculite "may reasonably be said to have the effect of managing or governing rail transportation," or instead has only "a more remote or incidental effect on rail transportation." *Id.* at 1097-98 (internal quotation marks omitted).

Here, applying Montana's strict liability law to BNSF's transportation of vermiculite would have the effect of managing or governing rail transportation; ICCTA preemption therefore applies. Several related reasons support this conclusion.

First, allowing strict liability for BNSF's transportation of vermiculite would impose severe compliance costs. Recall that in this case, Plaintiffs seek to hold BNSF strictly liable for all injuries resulting from BNSF's failure to use equipment and practices that would have prevented the release of vermiculite residuals from its railyard. To ensure future compliance with this sky-high standard of care, BNSF would have to adopt a variety of new equipment and practices—including possibly redesigning its railcars, altering switching operations in its railyard, purchasing new equipment, and implementing new training and operating procedures. Adopting these measures would impose a serious financial burden. And BNSF would have to implement these onerous compliance measures despite the fact that under HMTA, vermiculite does not qualify as a hazardous material warranting federal regulation of its transportation by rail carriers—even when the vermiculite contains toxic asbestos. *See* 49 U.S.C. § 5101 *et seq.*; 49 C.F.R. § 172.102(c)(1)(156) (stating that "[a]sbestos that is

immersed or fixed in a . . . mineral ore . . . is not subject" to HMTA regulatory requirements). Plaintiffs' strict liability claims, regardless of whether separately preempted by HMTA, function as regulations akin to those issued under HMTA authority.

Second, permitting strict liability here would allow for unpredictable and unfair penalties for noncompliance. Under a strict liability regime, the remedy provided by Montana law for any harmful release of vermiculite residuals is damages, as awarded by a jury. And as the Supreme Court has recognized, "state regulation can be . . . effectively exerted through an award of damages, and the obligation to pay compensation can be, indeed is designed to be, a potent method of governing conduct and controlling policy." *Kurns v. R.R. Friction Prods. Corp.*, 565 U.S. 625, 637 (2012) (citation modified). In this case, Plaintiffs' damage awards totaled to eight million dollars, not including additional taxable costs or interest. This suggests the magnitude of BSNF's potential exposure in the many other pending claims against it. *See* Majority Op. at 9. These damage awards resemble financial penalties for noncompliance similar to (1) remedies provided by ICCTA for regulatory violations and for persons injured by rail carriers, *see* 49 U.S.C. §§ 11701-11704, and (2) fees and penalties assessed for noncompliance with HMTA regulations, *see id.* §§ 5122-5124.

Third, applying strict liability here can be expected to increase rates that BNSF and other rail carriers charge customers. Based on the facts of this case, liability would show rail carriers that they can face future liability for transporting materials that are not considered to be hazardous at the time of transport. So carriers may reasonably seek to hike rates to account for the costs and

penalties associated with a strict liability standard for transporting not only vermiculite but also an unforeseen range of other materials.

In sum, the application of strict liability to BNSF's transportation of vermiculite would have tremendous economic consequences, effectively governing BNSF's railroad operations and unreasonably interfering with interstate commerce. In this regard, Montana's generally applicable strict liability law appears similar to state and local regulations that we have previously held to be preempted by ICCTA. *See City of Auburn*, 154 F.3d at 1027-31 (invalidating county review of the environmental impact of proposed operations on railway line); *Ass'n of Am. R.R.s*, 622 F.3d at 1095-98 (nullifying local rules "aimed at limiting the air pollution created by idling trains"); *Or. Coast Scenic R.R.,* 841 F.3d at 1076-77 (enjoining application of Oregon's "'remove-fill law,' which, among other things, require[d] a state permit for the removal of any amount of material from" designated waters).

\* \* \*

Today we correctly hold that BNSF is entitled to the common carrier exception to strict liability for its transportation of vermiculite. Majority Op. at 11-17. I would further hold that ICCTA preempts Plaintiffs' attempt to recover damages from BNSF, based on strict liability under Montana law, for injuries resulting from BNSF's transportation of vermiculite.